07-1715-ag
Bah v. Mukasey, Diallo v. DHS, Diallo v. DHS

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

—————————

August Term, 2007

(Argued: April 29, 2008                                    Decided: June 11, 2008)

Docket Nos. 07-1715-ag, 07-1994-ag, 07-2120-ag
(consolidated for disposition)

—————————————

SALIMATOU BAH,

*Petitioner,*

— v. —

MICHAEL B. MUKASEY, ATTORNEY GENERAL,

*Respondent.*

—————————————

*consolidated for disposition with*

—————————————

MARIAMA DIALLO,

*Petitioner,*

— v. —

DEPARTMENT OF HOMELAND SECURITY,

*Respondent.*

—————————————

*consolidated for disposition with*

—————————————

HABY DIALLO,

*Petitioner,*

— v. —

DEPARTMENT OF HOMELAND SECURITY,

*Respondent.*

—————————————

Before:

STRAUB, POOLER, and SOTOMAYOR, *Circuit Judges.*

—————————————

Salimatou Bah, Mariama Diallo, and Haby Diallo, natives of Guinea, petition for review of decisions of the Board of Immigration Appeals (BIA) affirming conclusions of Immigration Judges that petitioners were not eligible for withholding of removal based on the genital mutilation they suffered in the past. Because we conclude that the BIA erred in its application of the regulatory framework for withholding of removal with respect to this aspect of petitioners' claims, the petitions for review are granted in part. Other parts of the petitions for review are denied in part and dismissed in part for the reasons set forth in a separately filed summary order.

Judges STRAUB and SOTOMAYOR also concur in separate opinions.

———————————————

RONALD S. SALOMON, New York, NY, *for Petitioner Salimatou Bah*.

THEODORE VIALET, New York, NY, *for Petitioners Mariama Diallo and Haby Diallo*.

MICHAEL C. HEYSE & JESSICA E. SHERMAN, Trial Attorneys (Peter D. Keisler, Assistant Attorney General, Jeffrey S. Bucholtz & Gregory G. Katsas, Acting Assistant Attorneys General, Mary Jane Candaux & Michelle Latour, Assistant Directors, Joshua Braunstein, Cindy S. Ferrier, Lyle D. Jentzer, & Margaret Perry, Senior Litigation Counsel, Stacey I. Young, Trial Attorney, Ali Manuchehry, Law Clerk, *on the briefs*), Civil Division, Office of Immigration Litigation, U.S. Department of Justice, Washington, DC, *for Respondents*.

ANA C. REYES (Robin E. Jacobsohn, *on the brief*, Christopher N. Manning, *of counsel*), Washington, DC, *for Amicus Curiae Center for Gender and Refugee Studies*.

———————————————

STRAUB, *Circuit Judge*:

Petitioners, three women from Guinea who underwent female genital mutilation in the past, petition for review of decisions of the Board of Immigration Appeals ("BIA") affirming, *inter alia*, the denial of their claims for withholding of removal and Convention Against Torture ("CAT") relief based on female genital mutilation. The agency held that because the genital mutilation had already occurred, the presumption that petitioners' lives or freedom would be threatened in the future was automatically rebutted by the fact that it had occurred. *See* 8 C.F.R. § 1208.16(b)(1)(i)(A).

Because the agency committed significant errors in the application of its own regulatory

2

framework for withholding of removal claims, we grant in part and dismiss in part the petitions for review with respect to petitioners' withholding of removal and CAT claims based on female genital mutilation.[1]

**BACKGROUND**

## I. Female Genital Mutilation

Female genital mutilation "is the collective name given to a series of surgical operations, involving the removal of some or all of the external genitalia, performed on girls and women primarily in Africa and Asia." *Abankwah v. INS*, 185 F.3d 18, 23 (2d Cir. 1999).[2] According to the World Health Organization, female genital mutilation can be classified into four different categories:

| | | |
|---|---|---|
| Type I | Excision of the prepuce with or without excision of part or all of the clitoris. | |
| Type II | Excision of the prepuce and clitoris together with partial or total excision of the labia minora. | |
| Type III | Excision of part or all of the external genitalia and stitching/ narrowing of the vaginal opening (infibulation). | |
| Type IV | Unclassified: Includes pricking, piercing or incision of clitoris and/or labia; stretching of clitoris and/or labia; cauterization by burning of clitoris and surrounding tissues; scraping . . . of the vaginal orifice or cutting . . . of the vagina; Introduction of corrosive substances into the vagina to cause bleeding or herbs into the vagina with the aim of tightening or narrowing the vagina; any other procedure which falls under the definition of FGM. . . .[3] | |

---

[1] The remainder of petitioners' claims are addressed separately in a summary order filed today. The three cases were heard in tandem and have been consolidated for disposition.

[2] The term "female genital mutilation" (often referred to as "FGM") is sometimes used interchangeably with other terms, including female genital "circumcision," "cutting," "surgery," or "alteration." *See*, *e.g.*, Dena S. Davis, *Male and Female Genital Alteration: A Collision Course with the Law?*, 11 Health Matrix 487, 487–93 (2001). We use the term "female genital mutilation" because it is the term used by all parties, amicus, and the BIA.

[3] The World Health Organization defines female genital mutilation as "all procedures which involve partial or total removal of the external female genitalia or other injury to the

World Health Organization, *Female Genital Mutilation: Information Pack*, at 2 (August 1996) (hereinafter "WHO Information Pack").[4] The U.S. Department of State has largely adopted this classification. *See* Office of the Senior Coordinator for Women's Issues, U.S. Dep't of State, *Prevalence of the Practice of Female Genital Mutilation (FGM); Laws Prohibiting FGM and Their Enforcement; Recommendations on How to Best Work to Eliminate FGM, U.S. Dept. of State* 5 (June 27, 2001), *available at* www.state.gov/g/wi/rls/rep/c6466.htm or http://www.state.gov/documents/organization/9424.pdf (last visited June 10, 2008).

Genital mutilation "is often performed under unsanitary conditions with highly rudimentary instruments." *Abankwah*, 185 F.3d at 23.

> The procedure is carried out with special knives, scissors, scalpels, pieces of glass or razor blades [in] poor light and septic conditions. The procedures are usually carried out by an elderly woman of the village who has been specially designated for this task, or by traditional birth attendants. . . . Anaesthetics and antiseptics are not generally used. Assistants and/or family members hold down the girl to prevent her struggling. . . . Paste mixtures made of herbs, local porridge, ashes, or other mixtures are rubbed on to the wound to stop bleeding.

WHO Information Pack at 3. Genital mutilation can have devastating, permanent effects on its victims, including immediate and long-term physical problems such as infection, difficulty during urination and menstruation, incontinence, and sexual dysfunction; complications during child birth such as fetal and maternal death, birth defects, and internal damage to the mother; and severe psychological problems.[5] *Id*. at 7–10.

---

female genital organs whether for cultural or any other non-therapeutic reasons."

[4] This document and other similar documents were contained in the records before the BIA.

[5] As one scholar explained:

> Long term physical problems include the formation of keloid scars, ruptures in the vagina that can lead to incontinence later in life, dysmennorhea or

The reasons for infliction of genital mutilation vary. *Id*. at 4. Some of the most prevalent reasons for genital mutilation are to preserve virginity before marriage and encourage fidelity during marriage. *See*, *e.g.*, James Rice, *A Successful Case is Made for Granting Refugee Status to*

extremely painful menstruation, the development of neuroma, which could cause the entire genital area to become permanently too painful to even touch, dyspareunia or extreme pain during sexual intercourse and sterility due to infections that can spread through the cervix and into the uterus, Fallopian tubes and ovaries. In addition, infibulated women can experience problems especially if the opening left is too small. The opening may be too small to allow menstrual blood to escape, or in some extreme cases, urine may not even be able to pass through the opening normally. Often, if a woman has been infibulated, it can take her ten to fifteen minutes to urinate. It is clear, therefore, that many women who undergo female genital mutilation continue to suffer daily pain throughout their lives.

. . .

Childbirth is a dangerous event for women who have undergone FGM, especially infibulated women. . . . Fetal and maternal death, brain-damaged babies and severe internal damage to the mother are often associated with women who have undergone FGM, and particularly infibulation.

. . .

FGM can cause severe psychological problems as well. . . . Some researchers have concluded that the severe pain of FGM, concentrated in such a sensitive and delicate area, and performed during early formative years, does cause psychological problems. In addition, many girls experience fear and anxiety when they first learn they will have to undergo the procedure. The procedure itself is also frightening; the young girls are held down, sometimes gagged, their legs are spread apart, and they are cut without anesthesia. Often, their mother or some other female relative is involved, which can add a sense of immense betrayal as well.

FGM has also been associated with psychological problems surrounding sexual intercourse . . . . According to some studies, women who have experienced FGM are often afraid of sex, experience extreme pain from the act, and receive little, if any, enjoyment from sexual relations.

Alexi Nicole Wood, *A Cultural Rite of Passage or a Form of Torture: Female Genital Mutilation from an International Law Perspective*, 12 Hastings Women's L.J. 347, 363–67 (Summer 2001) (internal footnotes and quotation marks omitted).

5

*a Woman Fleeing Her Own Country to Protect Her Daughter from Female Genital Mutilation*, Gonz. J. Int'l L., Vol. 4, No. 4, at 3 (2000-2001) ("To a large extent, [female genital mutilation] is done to discourage sexual activity before marriage."); Leigh A. Trueblood, *Female Genital Mutilation: A Discussion of International Human Rights Instruments, Cultural Sovereignty and Dominance Theory*, 28 Denv. J. Int'l L. & Pol'y 437, 449 (Fall 2000) ("Supporters of FGM believe that they can reduce sexual desire in females by eliminating the sensitive tissue of the outer genitalia, particularly the clitoris. By attenuating women's sexual desire, the women can maintain their chastity and virginity before marriage and fidelity during marriage. . . . They also believe that removal of female genitalia results in higher male sexual pleasure."); WHO Information Pack at 4 (listing "protection of virginity and prevention of promiscuity" as reasons for the practice).

In light of the long-lasting and severe consequences of genital mutilation, paired with the reasons for its infliction, the practice has been largely condemned by the international community. *See*, *e.g.*, World Health Organization, *Eliminating Female Genital Mutilation: An Interagency Statement OHCHR, UNAIDS, UNDP, UNECA, UNESCO, UNFPA, UNHCR, UNICEF, UNIFEM, WHO* (2008), http://www.who.int/reproductive-health/publications/fgm/ fgm_statement_2008.pdf (last visited June 10, 2008); Committee on the Elimination of All Forms of Discrimination Against Women, Female Circumcision General Recommendation No. 14, U.N. GAOR, 45th Sess., Supp. No. 38 & Corr. 1, at 80, ¶ 438, U.N. Doc. A/45/38 (1990); Declaration on the Elimination of Violence against Women, G.A. Res. 104, U.N. GAOR, 48th Sess., Art. 2(a), U.N. Doc. A/ 48/629 (1993) (including female genital mutilation as an example of violence sought to be eliminated). It has also been criticized and condemned by many activist groups within the countries where it is practiced. *See*, *e.g.*, Inter-African Committee on

6

Traditional Practices Homepage, http://www.iac-ciaf.com (last visited June 10, 2008) (stating that the "IAC was the first and largest NGO network in Africa to take up the issue of FGM at the grassroots, regional and international levels"); WHO Information Pack at 15 (stating that various conferences and seminars in Africa and Asia have recommended that "governments should adopt clear national policies to abolish FGM"). Moreover, in recognition of the harmful effects of genital mutilation, the United States Congress has criminalized female genital mutilation of minors in the United States. *See* 18 U.S.C. § 116(a) (providing that "whoever knowingly circumcises, excises, or infibulates the whole or any part of the labia majora or labia minora or clitoris of another person who has not attained the age of 18 years" shall be fined or imprisoned for up to five years).

**II.    Petitioner Salimatou Bah**

Petitioner Salimatou Bah seeks review of the March 26, 2007 order of the BIA affirming the August 23, 2005 decision of Immigration Judge ("IJ") Barbara A. Nelson denying her applications for asylum, withholding of removal, and relief under the CAT. *In re Salimatou Bah*, No. A98 648 305 (B.I.A. Mar. 26, 2007), *aff'g* No. A98 648 305 (Immig. Ct. N.Y. City Aug. 23, 2005). Salimatou,[6] a native and citizen of Guinea, entered the United States without valid travel documents in June 2003, and in January 2005 was placed in removal proceedings by service of a Notice to Appear ("NTA"). She applied for asylum, withholding of removal, and relief under the CAT, alleging, *inter alia*, that as a young girl she "suffered" the "barbarous act" of female genital mutilation, and the event "still has dire consequences on [her] adult life."

In a statement accompanying her application, Salimatou explained that she belongs to the

---

[6] While we normally use parties' last names, two of the petitioners in these cases have the same last name; therefore, to avoid confusion, we will use the petitioners' first names.

Fulani ethnic group, which strongly supports the practice of genital mutilation as "the best way to prevent the Fulani girls from having pre-marital sex," and "to force the Fulani girls to keep their virginity until the marriage." She claimed that at the age of eleven, her mother and aunt took her to a "small area fenced with wood and stuffed with coconut leaves." She was taken into a tent where five "old ladies" with knives and other tools undressed her and had her lie on the ground. Salimatou, "scared and shaking," tried to escape, but the women restrained her. She was then held down by two of the women while two others opened her legs so that a fifth could make a "deep cut of [her] 'private part'" without "any anesthetic or sanitary precaution." Salimatou screamed throughout the mutilation, and experienced "pain all over [her] body." She began "bleeding heavily" and feeling dizzy to the point where she was unable to stand on her own. After she was given "traditional medicines," she convalesced for weeks during which time she was "treated traditionally with dried leaves and some other local potions." Salimatou further stated that she later had "problems with [her] menstrual period," as well as complications during the deliveries of her children. She also stated that she "can barely feel any pleasure" during sexual intercourse with her husband. She sought asylum in order to "live free from that barbarous act still in practice" in Guinea.

On August 23, 2005, at the conclusion of her merits hearing, the IJ denied all of Salimatou's claims. The IJ pretermitted Salimatou's asylum application based on a finding that the application failed to meet the one-year deadline set forth in 8 U.S.C. § 1158(a)(2)(B).[7] With respect to her withholding of removal claim based on female genital mutilation, the IJ found that although Salimatou had established past persecution, she had not established that there was any

---

[7] This deadline does not apply to withholding of removal or CAT claims. *See* 8 C.F.R. § 208.4(a).

clear probability of future persecution if returned to Guinea. The IJ found that although Salimatou's "circumcision [was] a very unfortunate event," it could not be repeated. The IJ accordingly denied the withholding of removal claim on that basis and further found that Salimatou did not qualify for CAT relief because she "offered insufficient evidence to establish it is more likely than not that she would be tortured if returned to Guinea."

Salimatou appealed the decision to the BIA, and in a one-member unpublished order signed by Board Member Roger Pauley, the BIA affirmed the IJ's decision that the asylum application had been untimely filed. With respect to her withholding of removal claim, the BIA acknowledged that Salimatou had "already had FGM"; however, it held that "assuming *arguendo* that she is a member of a particular social group who suffered past persecution[,] there is no chance that she would be personally persecuted again by the procedure." (internal alterations, footnote, and quotation marks omitted). The BIA then went on to assess whether female genital mutilation should be considered "continuing persecution" as found by the Ninth Circuit in *Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005). In *Mohammed*, the Ninth Circuit held in the asylum context that female genital mutilation constituted a "permanent and continuing" act of persecution such that the presumption of well founded fear of future persecution "cannot be rebutted." *Id*. at 801. The BIA in this case explicitly disagreed with *Mohammed*. In so doing, it distinguished *In re Y-T-L-*, 23 I. & N. Dec. 601 (B.I.A. 2003) (en banc) ("*Y-T-L-*"), in which the BIA held that forced sterilization amounted to continuing persecution. The BIA in the present case reasoned that "persons who suffered [forced sterilization] have been *singled out* by Congress as having a basis for asylum . . . on the strength of the past harm by itself," and because "Congress has not seen fit to recognize FGM . . . in similar fashion," the BIA declined to define the genital mutilation that Salimatou suffered as continuing persecution. Finally, the BIA noted

9

that while humanitarian asylum might be warranted in some genital mutilation cases "notwithstanding the low likelihood of future persecution," such discretionary relief is not available in withholding of removal cases.[8] The BIA further agreed with the IJ's denial of the CAT claim because Salimatou "failed to present evidence that she more likely than not would be tortured if returned to Guinea." Accordingly, the BIA dismissed Salimatou's appeal as to the withholding of removal and CAT claims based on genital mutilation.

### III.     Petitioner Mariama Diallo

Petitioner Mariama Diallo seeks review of an April 12, 2007 order of the BIA affirming the July 1, 2005 decision of IJ Barbara A. Nelson denying her applications for asylum, withholding of removal, relief under the CAT, and cancellation of removal. *In re Mariama Diallo, Amadou Sow*, Nos. A97 849 373; A97 849 374 (B.I.A. Apr. 12, 2007), *aff'g* Nos. A97 849 373; A97 849 374 (Immig. Ct. N.Y. City July 1, 2005). Mariama, also a native and citizen of Guinea and a member of the Fulani ethnic group, was admitted into the United States in May 1992 on a nonimmigrant visa, which she overstayed. In September 2003, Mariama filed an application for asylum, withholding of removal, and CAT relief. In February 2005, Mariama amended her application to include a claim that she had been subjected to female genital mutilation as a child. She also filed a separate application for cancellation of removal.

At a merits hearing in March 2005, Mariama testified that she underwent genital

---

[8] 8 C.F.R. § 1208.13(b)(1)(iii) provides that, even in the absence of a well founded fear of future persecution, an applicant may be granted asylum "in the exercise of the decision-maker's discretion, if . . . [t]he applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or . . . [t]he applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." No such authority exists with respect to claims for withholding of removal under 8 U.S.C. § 1231(b)(3)(A). *See* 8 C.F.R. § 1208.16.

mutilation, including "removal of [her] clitoris," when she was eight years old. According to Mariama, her parents were opposed to the practice of FGM, but her aunt and grandmother arranged for her to undergo the mutilation without their knowledge. Mariama further testified that she was ill for a month after the mutilation, suffering constant pain, excessive bleeding, and loss of consciousness. Mariama testified that childbirth was extremely difficult for her, and that she experiences pain every time she engages in intercourse as a result of the genital mutilation. She further testified that she suffered two miscarriages. Finally, Mariama stated that she feared that her daughters would be subject to genital mutilation were she forced to return to Guinea. In support of her female genital mutilation claim, she submitted a gynecologist's report stating, inter alia: "Evaluation of the pelvis demonstrated a scarred anterior fourchette and surgically absent clitoris. The labia minora were rudimentary and anteriorly fused." The report further stated that Mariama "has compromised intimacy and sexual satisfaction," and that she "requires repetitive surgical correction of her anterior fourchette to accommodate vaginal deliveries."

At the conclusion of the hearing, the IJ denied Mariama's applications in their entirety. First, the IJ found that Mariama's asylum claim was time-barred because she entered the country in 1992 but did not file her application until 2003. As to her withholding of removal claim, the IJ concluded that Mariama had established past persecution by submitting reliable evidence that she had undergone female genital mutilation. Nevertheless, the IJ denied the withholding of removal claim based on genital mutilation because there was "obviously no chance" that she would be subjected to genital mutilation again in the future. Finally, the IJ denied Mariama's application for cancellation of removal.

Mariama timely appealed the denial of her applications to the BIA. In a three-member unpublished order issued by Board Members Patricia A. Cole, Lauri S. Filppu (author), and

Roger Pauley, the BIA found that the IJ properly pretermitted Mariama's asylum application. The BIA further concluded that the fact that Mariama had undergone genital mutilation was not a basis for the grant of withholding of removal, "even assuming *arguendo* that she is a member of a particular social group who suffered past persecution." As in Salimatou's case, the BIA reasoned that because genital mutilation could be performed only once, Mariama had not established a possibility of future persecution. The BIA explicitly rejected Mariama's argument that the genital mutilation constituted continuing persecution. The BIA again distinguished genital mutilation from forced sterilization, reasoning that Congress specifically singled out sterilization as a basis for asylum but has not designated genital mutilation in the same way. It also noted that Mariama was ineligible for discretionary relief on humanitarian grounds due to the fact that her asylum application was untimely filed. With respect to Mariama's CAT claim, the BIA concluded that Mariama had presented no evidence suggesting that she would more likely than not be tortured if she returned to Guinea. Finally, the BIA affirmed the denial of Mariama's application for cancellation of removal.

**IV.    Petitioner Haby Diallo**

Petitioner Haby Diallo seeks review of an April 20, 2007 order of the BIA affirming the August 12, 2005 decision of IJ Sandy K. Hom denying her applications for asylum, withholding of removal, and relief under the CAT. *In re Haby Diallo,* No. A97 924 445 (B.I.A. Apr. 20, 2007), *aff'g* No. A97 924 445 (Immig. Ct. N.Y. City Aug. 12, 2005).

Haby is also a native and citizen of Guinea and member of the Fulani ethnic group. She applied for asylum, withholding of removal, and relief under the CAT, alleging that she had been subjected to female genital mutilation as a child, that she "totally opposed" the practice, and that she did not want her "future daughters" to be subjected to it. At her merits hearing, Haby testified

12

that she was forced to undergo genital mutilation when she was eight years old. She testified that during a visit to her grandmother, she was taken by "three old women" to "the bush." There, one woman held her down while another spread her legs apart and the third performed the mutilation with a knife. Haby testified that she "suffered a lot" initially, and although she was bleeding heavily, she was not taken to a hospital. Instead, she was treated with "traditional medicine." She further testified that she has problems menstruating as a result of the genital mutilation, and that she does "not have any type of pleasure when [she is] having [] sexual intercourse with a man." Finally, she testified that she is "definitely" against female genital mutilation. In support of her claim, she submitted an affidavit from a doctor stating that his physical examination yielded results "compatible with" her allegation of having been subject to genital mutilation in the past.

In August 2005, the IJ denied Haby's application in its entirety. The IJ pretermitted Haby's asylum claim because Haby failed to establish that her application was filed within one year of her entry into the United States. The IJ further found Haby's claim that she had experienced genital mutilation "to be insufficient and lacking" because a doctor's written statement was "insufficient," and both the doctor's failure to testify and the absence of affidavits from Haby's family members were "adverse" to her claim. Finally, the IJ found that Haby failed to demonstrate that it was more likely than not that she would be subjected to torture if she were returned to Guinea.

Haby timely appealed the IJ's decision to the BIA, and in a one-member unpublished order signed by Board Member Roger Pauley, the BIA dismissed Haby's appeal. The BIA affirmed the IJ's decision as to the one-year asylum bar. With respect to the IJ's denial of Haby's claims for relief based on female genital mutilation, the BIA agreed with the "overall outcome of the instant proceedings for reasons different" from those of the IJ. The BIA stated that Haby had

13

"already had FGM," but that, even "assuming *arguendo* that she is a member of a particular social group who suffered past persecution," she was not entitled to withholding of removal because she would not be subjected to the procedure in the future. The BIA again rejected the Ninth Circuit's reasoning in *Mohammed*, and it again noted that Haby was ineligible for humanitarian relief. Finally, the BIA found that because Haby failed to establish eligibility for asylum,[9] she necessarily failed to satisfy the higher standard for withholding of removal and CAT relief.

## V. *In re A-T-*

Soon after the BIA issued the unpublished decisions in these three cases, the BIA issued a three-member published decision affirming the denial of a claim for withholding of removal based on female genital mutilation, for reasons substantially similar to those given by the BIA in the present cases. *See In re A-T-*, 24 I. & N. Dec. 296 (B.I.A. 2007) ("*A-T-*"), *appeal docketed*, No. 07-2080 (4th Cir. Nov. 1, 2007).[10] The government in the cases before us contends that petitioners' arguments are foreclosed by *A-T-*; accordingly, some background as to that case is necessary.

---

[9] It is unclear why the BIA in this concluding sentence treated Haby's female genital mutilation claim as though it were a claim for asylum, even though it had already determined that her asylum application was properly pretermitted.

[10] The Board Members who decided *A-T-* are Patricia A. Cole, Lauri S. Filppu (author), and Roger Pauley. As previously noted, Board Member Pauley decided Salimatou's and Haby's cases, and all three Board Members on *A-T-* decided Mariama's case. The BIA recently denied reconsideration in *A-T-* in an unpublished decision authored by Board Member Pauley on behalf of all three Board Members. *See In re Alima Traore*, No. A72 169 850 (B.I.A. Apr. 14, 2008), *appeal docketed*, No. 08-1557 (4th Cir. May 16, 2008). The original *A-T-* decision and the denial of the motion for reconsideration are currently on appeal to the Fourth Circuit.

Alima Traore,[11] a native and citizen of Mali, claimed that she underwent genital mutilation as a young girl, that she opposed the practice, and that were she to have a daughter, she would oppose having genital mutilation performed on her daughter. She further claimed that if she were returned to Mali, she would be forcibly married to her cousin. She sought asylum, withholding of removal, and CAT relief. *Id.* at 296–97. As in the present cases, the IJ found Traore ineligible for asylum because her asylum application was untimely filed. The IJ further found that Traore's past experience with genital mutilation did not qualify her for the "prospective relief" of withholding of removal, and that Traore had not demonstrated that it was more likely than not that she would be forcibly married to her cousin. Finally, the IJ found that Traore failed to establish that it was more likely than not that she would be tortured upon return to Mali. Accordingly, the IJ denied her application in its entirety. *Id.* at 297.

Traore appealed to the BIA, and the BIA affirmed the IJ's decision in all respects. First, while recognizing that female genital mutilation constituted persecution under its own precedent, the BIA held that "even assuming arguendo that [Traore] is a member of a particular social group, there is no chance that she would be personally persecuted again by the procedure." *Id.* at 299 (internal alteration and quotation marks omitted). Accordingly, the BIA found that "[a]ny presumption of future FGM persecution is thus rebutted by the fundamental change in the respondent's situation arising from the reprehensible, but one-time, infliction of FGM upon her." *Id.* The BIA again went on to "disagree with the analysis" in the Ninth Circuit's decision in *Mohammed*, stating that it viewed *Y-T-L-*'s "continuing persecution" reasoning in the forced

---

[11] Although the BIA case refers to Traore as "A-T-" or "respondent," the Fourth Circuit's docket as well as the BIA's denial of the motion for reconsideration indicate that the petitioner's name is "Alima Traore." *See Traore v. Mukasey*, No. 07-2080 (4th Cir. filed Nov. 1, 2007); *In re Alima Traore*, No. A72 169 850 (B.I.A. Apr. 14, 2008).

sterilization context "to represent a unique departure from the ordinarily applicable principles regarding asylum and withholding of removal." *A-T-*, 24 I. & N. Dec. at 299. The BIA explained that even though it viewed forced sterilization as a "past harm" in *Y-T-L-*, it considered forced sterilization to be continuing persecution in order to give "full force to the intent of Congress in extending asylum to those who have sustained such family planning persecution in the past." *Id.* at 300 (internal quotation marks omitted). The BIA analogized genital mutilation to the "loss of a limb," which "also gives rise to enduring harm to the victim," but is "assessed under the past persecution standards specified in the asylum and withholding of removal regulations." *Id.* at 301. The BIA also recognized the availability of a discretionary grant of asylum based on the severity of the past persecution, but stated in any event that such a discretionary grant was not available to Traore, since she did not qualify for asylum. *Id.* at 302.[12]

The BIA further affirmed the IJ's holding that Traore was not eligible for withholding of removal based on her fear of a forcible marriage. The BIA rejected Traore's argument that "her past experience with FGM creates a presumption that she is at risk of future persecution; that is, even if she cannot be subjected to FGM a second time, she may be vulnerable to other forms of persecution on account of her membership in a particular social group." *Id.* at 303–04.[13]

---

[12] Subsequently, in *In re S-A-K- and H-A-H-*, 24 I. & N. Dec. 464 (B.I.A. 2008), the BIA explicitly held that victims of past female genital mutilation could qualify for discretionary grants of asylum under 8 C.F.R. § 1208.13(b)(1)(iii)(A) based on the severity of the past harm alone.

[13] The BIA also affirmed the IJ's holding that Traore was not eligible for withholding of removal based solely on her fear of forcible marriage. The BIA initially "note[d] that an arranged marriage between adults is not generally considered per se persecution." *A-T-*, 245 I. & N. Dec. at 302. It then reasoned that Traore had "presented insufficient evidence regarding the consequences she might face if she refuses to marry her intended fiancé," that she could "reasonably relocate within Mali to avoid the marriage," and that Traore "failed to demonstrate a nexus between any harm she may fear and a protected ground." *Id.* at 303. The BIA stated that it doubted "that young Bambara women who oppose arranged marriage have the kind of social

16

The BIA noted that the reasoning of *Hassan v. Gonzales*, 484 F.3d 513 (8th Cir. 2007), "appear[ed] to support [Traore's] theory," but the BIA rejected it as "at odds" with the regulatory framework for asylum. *A-T-*, 245 I. & N. Dec. at 304. In *Hassan*, the Eighth Circuit held that the fact that a petitioner had undergone genital mutilation in the past does not mean that a fear of future persecution is automatically rebutted, stating that the court has "never held that a petitioner must fear the repetition of the exact harm that she has suffered in the past." 484 F.3d at 518. The BIA found that this reasoning contravened the regulation, which provides that "[i]f the applicant's fear of future persecution is unrelated to the past persecution, the applicant bears the burden of establishing that the fear is well-founded." *A-T-*, 245 I. & N. Dec. at 304 (quoting 8 C.F.R. § 1208.13(b)(1)). *See also* 8 C.F.R. § 1208.16(b)(1)(iii) (providing, in the context of withholding of removal claims, that "[i]f the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm"). The BIA reasoned that unlike female genital mutilation, "family pressures to accede to arranged marriages are not necessarily confined to females." *A-T-*, 24 I. & N. Dec. at 304. The BIA then found, without discussing other forms of future persecution that Traore may have feared on account of her particular social group, that Traore's fear of forced marriage was unrelated to the genital mutilation she suffered in the past, and that Traore had failed to meet her burden of showing that she would be subject to such persecution in the future. *Id*. Finally, the BIA rejected Traore's CAT claim, holding that Traore "failed to present evidence that it is more likely than not that she would be tortured if she is

---

visibility that would make them readily identifiable to those who would be inclined to persecute them." *Id*.

returned to Mali." *Id.*[14]

**DISCUSSION**

**I.       Standard of Review**

We review the agency's factual findings under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see, e.g., Manzur v. U.S. Dep't of Homeland Sec.*, 494 F.3d 281, 289 (2d Cir. 2007). However, we will vacate and remand for new findings if the agency's reasoning or its fact-finding process was sufficiently flawed. *See Cao He Lin v. U.S. Dep't of Justice*, 428 F.3d 391, 406 (2d Cir. 2005); *Tian-Yong Chen v. INS*, 359 F.3d 121, 129 (2d Cir. 2004). We review *de novo* questions of law and the application of law to undisputed fact. *See Secaida-Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003).

We review decisions by the BIA interpreting the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., according to the standard set forth in *Chevron, U.S.A., Inc. v.*

---

[14] Since publication of *A-T-*, various members of Congress as well as organizations have requested that the Attorney General certify the decision to himself pursuant to 8 C.F.R. § 1003.1(h)(1)(i) and reverse it. *See*, *e.g.*, Letter and Addendum from Members of Congress to Michael Mukasey, U.S. Attorney General (Dec. 20, 2007; Mar. 24, 2008), http://cgrs.uchastings.edu/pdfs/DOC3-%20Addendum_FGM%20Letter_HOUSE-032408.pdf (last visited June 10, 2008); Press Release, Reps. Lofgren and Conyers Call on Attorney General to Review Female Genital Mutilation Ruling (Jan. 30, 2008), http://lofgren.house.gov/PRArticle.aspx?NewsID=1879 (last visited June 10, 2008); Press Release, Snowe, Levin Call on Attorney General to Review Female Genital Mutilation Ruling (Apr. 29, 2008), http://snowe.senate.gov/public/ (click on press room/press releases, search for press release by date) (last visited June 10, 2008), text of letter available at http://cgrs.uchastings.edu/documents/advocacy/matterofat_senate_letter_Mukasey.pdf (last visited June 10, 2008); Letter from Physicians for Human Rights Asylum Network to Michael B. Mukasey, U.S. Attorney General (Mar. 6, 2008), http://cgrs.uchastings.edu/pdfs/DOC12-Letter_physicians_psychologists_PHR.pdf (last visited June 10, 2008); Letter from Barry M. Kamins, President, New York City Bar, to Michael B. Mukasey, U.S. Attorney General (Jan. 4, 2008), http://www.nycbar.org/pdf/report/0424_001.pdf (last visited June 10, 2008).

*Natural Res. Def. Council, Inc.*:

> If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, . . . the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. 837, 842-43 (1984).[15] *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999)

(holding that decisions of the BIA interpreting the INA are entitled to *Chevron* deference). And

we give "substantial deference" to BIA decisions interpreting immigration regulations, *Delgado*

*v. Mukasey*, 516 F.3d 65, 69 (2d Cir. 2008), unless an interpretation is "plainly erroneous or

inconsistent with the regulation," *Auer v. Robbins*, 519 U.S. 452, 461 (1997). *See also Zhen Nan*

*Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 262 (2d Cir. 2006).

## II.     Regulatory Framework and Merits of the Petitions for Review

Pursuant to 8 U.S.C. § 1231(b)(3)(A), an alien may not be removed to a country if "the

alien's life or freedom would be threatened in that country because of the alien's race, religion,

nationality, membership in a particular social group, or political opinion." Under the relevant

regulations:

> If [an] applicant [for withholding of removal] is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim.

8 C.F.R. § 1208.16(b)(1)(i). The presumption that arises upon a showing of past persecution can

---

[15] No such deference is warranted where, as here, the agency decisions are unpublished, because those decisions do not constitute binding agency interpretations of law. *See Mizrahi v. Gonzales*, 492 F.3d 156, 158 (2d Cir. 2007). However, because the BIA subsequently issued a published decision containing essentially the same reasoning as that relied upon in the present cases, we will review the decisions—at least to the extent they are mirrored in *A-T-*—under this deferential standard, as the government urges.

be rebutted if the IJ finds, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five grounds mentioned in this paragraph upon the applicant's removal to that country," or that "[t]he applicant could avoid a future threat to his or her life or freedom by relocating to another part of the proposed country of removal and, under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. §§ 1208.16(b)(1)(i)(A), (B). If an applicant has established past persecution on account of one of the protected grounds, the government bears the burden of rebutting the presumption that the applicant's life or freedom will be threatened in the future by a preponderance of the evidence. 8 C.F.R. § 1208.16(b)(1)(ii).

For the reasons that follow, we hold that under the governing regulations the fact that an applicant has undergone female genital mutilation in the past cannot, in and of itself, be used to rebut the presumption that her life or freedom will be threatened in the future. In so holding, we join in part the Eighth and Ninth Circuits, which have previously rejected facets of the reasoning the BIA now advances on this front.[16]

We pause only to say that we are deeply disturbed by what we perceive to be fairly obvious errors in the agency's application of its own regulatory framework. Congress has

---

[16] The government argues that petitioners have failed to exhaust and have waived certain arguments raised by amicus with respect to their withholding of removal claims arising from their own genital mutilation. We disagree. All three petitioners argued in their briefs to the BIA as well as to this Court that the BIA erred in its application of the regulatory framework with respect to the genital mutilation claims. Moreover, the BIA addressed the vast majority of the issues we now review on appeal in its decisions. Those issues are therefore deemed exhausted, *see Xian Tuan Ye v. Dep't of Homeland Sec.*, 446 F.3d 289, 296–97 (2d Cir. 2006) (per curiam); *Waldron v. INS*, 17 F.3d 511, 515 n.7 (2d Cir. 1994), and to the extent the BIA did not address certain issues, as explained below, we are remanding for the BIA to make those determinations in the first instance.

20

entrusted the agency with the weighty and consequential task of granting safe harbor to the deserving of those who flee to this country for protection. The claims of the petitioners before us, as set forth below, did not receive the type of careful analysis they were due. Our concern is only heightened by the very serious nature of the harm suffered by petitioners in these cases, which the BIA itself has previously recognized.

### A. Female Genital Mutilation as Past Persecution

In 1996, the BIA, acting en banc, held for the first time in a published opinion that female genital mutilation can constitute persecution on account of membership in a particular social group. *In re Kasinga*, 21 I. & N. Dec. 357 (B.I.A. 1996) (en banc). The BIA reasoned:

> FGM is extremely painful and at least temporarily incapacitating. It permanently disfigures the female genitalia. FGM exposes the girl or woman to the risk of serious, potentially life-threatening complications. These include, among others, bleeding, infection, urine retention, stress, shock, psychological trauma, and damage to the urethra and anus. It can result in permanent loss of genital sensation and can adversely affect sexual and erotic functions.

*Id*. at 361. Fauziya Kasinga, who was seeking asylum based on her fear that she would be subjected to genital mutilation if sent back to Togo, claimed that she was part of the social group consisting of "young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice." *Id*. at 365. In finding that the genital mutilation that Kasinga feared constituted persecution on account of membership in a particular social group, the BIA reasoned: "FGM is practiced, at least in some significant part, to overcome sexual characteristics of young women of the tribe who have not been, and do not wish to be, subjected to FGM. We therefore find that the persecution the applicant fears in Togo is 'on account of' her status as a member of the defined social group." *Id*. at 367.

In *Abankwah*, we found that "FGM involves the infliction of grave harm constituting

21

persecution"; a proposition that was "not disputed" in that case. *Abankwah*, 185 F.3d at 23. Since then, those of our sister circuits to have addressed the issue have agreed that female genital mutilation can constitute persecution for purposes of determining eligibility for asylum and withholding of removal. *See, e.g., Niang v. Gonzales*, 492 F.3d 505, 510 (4th Cir. 2007); *Agbor v. Gonzales*, 487 F.3d 499, 502 (7th Cir. 2007); *Hassan*, 484 F.3d at 517 (8th Cir. 2007); *Mohammed*, 400 F.3d at 796 (9th Cir. 2005); *Toure v. Ashcroft*, 400 F.3d 44, 49 n.4 (1st Cir. 2005); *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004); *Niang v. Gonzales*, 422 F.3d 1187, 1197 (10th Cir. 2005).[17]

In the cases before us, as in *A-T-*, the BIA found that each of the petitioners had undergone genital mutilation, but "assum[ed] arguendo"—without deciding— that the petitioners had been persecuted on account of their membership in a particular social group. While the government does not dispute that the type of genital mutilation performed on the petitioners in the cases before us can rise to the level of persecution, it urges us to leave for the agency to decide in the first instance whether such harm was inflicted on account of the petitioners' social group.

As some of our sister circuits have found in cases involving claims of female genital mutilation, it appears to us that petitioners' gender—combined with their ethnicity, nationality, or tribal membership—satisfies the social group requirement. *See, e.g., Niang*, 422 F.3d at 1199; *Hassan*, 484 F.3d at 518; *Mohammed*, 400 F.3d at 798.[18] Nevertheless, we will allow the agency

---

[17] In addition, we note that the Third Circuit has recognized that female genital mutilation can constitute persecution in an unpublished opinion. *See Moshud v. Blackman*, Nos. 98-6481, 02-1545, 68 Fed. Appx. 328, 2003 WL 21404334 (3d Cir. June 18, 2003).

[18] In *Abankwah*, we noted that the government "did not dispute that Abankwah's fear of genital mutilation was on account of her membership in a cognizable social group" and held that

22

to decide this issue as well as to define the parameters of the social group in the first instance, as the government urges. *Cf. Ucelo-Gomez v. Gonzales*, 464 F.3d 163, 168–72 (2d Cir. 2006) (remanding to allow the BIA to determine, in the first instance, whether the proffered particular social group is protectible under the INA).[19] In the meantime, we proceed with our analysis on the assumption made by the agency: that petitioners have suffered persecution on account of a protected ground.[20]

---

she had demonstrated a well founded fear of future mutilation. 185 F.3d at 21, 23–26.

[19] Although petitioners and amicus argue that the BIA's "assum[ption]" of a social group is sufficient to vest in this Court the authority to determine petitioners' social groups, we need not decide this issue. Because we are remanding these cases to the BIA to properly apply the regulatory framework in any event, we leave it to the agency to define the particular social groups in the first instance.

[20] The BIA in *Kasinga*, adopting a definition similar to the one advanced by the parties in that case, defined the applicant's particular social group as "young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice." 21 I. & N. Dec. at 365. Since then, our sister circuits have criticized the BIA's inclusion of opposition to genital mutilation in its definition of the social group. *See*, *e.g.*, *Niang*, 422 F.3d at 1200 ("[O]pposition is not a necessary component of a social group otherwise defined by gender and tribal membership."); *Mohammed*, 400 F.3d at 797 n.16 ("We believe that opposition is not required in order to meet the 'on account of' prong in female genital mutilation cases."). Indeed, the BIA in *Kasinga* explained why gender and tribal membership comported with its previously established framework for particular social groups, but failed to explain its reasoning for including opposition to the practice. *See* 21 I. & N. Dec. at 366. Moreover, the petitioners in this case testified that they underwent genital mutilation as children. There are obvious difficulties with trying to ascertain whether a child opposed or resisted a practice imposed upon them by adults in their community, sometimes even family members. *See*, *e.g.*, *Bah v. Gonzales*, 462 F.3d 637, 643 (6th Cir. 2006) (Gibbons, C.J., concurring) ("An eight year old girl's failure to physically resist a procedure performed by medical personnel and endorsed by her mother hardly establishes her consent or renders the procedure unable to be categorized as persecution.") (internal footnote omitted). Accordingly, although we leave the issue for the agency to decide in the first instance, unless the BIA reasonably explains why opposition to the practice is a necessary prerequisite, we tend to agree with the Ninth Circuit's observation that "the shared characteristic that motivates the persecution is not opposition, but the fact that the victims are female in a culture that mutilates the genitalia of its females." 400 F.3d at 797 n.16.

23

**B. Well Founded Fear of Future Threats to Life or Freedom**

As stated above, the regulations provide that once past persecution on account of a protected ground such as a particular social group is established, the petitioner benefits from a presumption that her "life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 1208.16(b)(1)(i). At that point, the burden shifts to the government, which may rebut the presumption upon a showing by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant's life or freedom would not be threatened on account of any of the five [protected grounds for relief] upon the applicant's removal to that country." 8 C.F.R. § 1208.16(b)(1)(i)(A). *Cf., e.g.,* *Hassan*, 484 F.3d at 518 (stating under the asylum regulation that after a showing of past persecution, "[t]he proof burden should have then shifted to the government to show by a preponderance of the evidence that [circumstances] have changed to such an extent that Hassan's well-founded fear of future persecution if returned to Somalia has ceased."); *accord Niang*, 422 F.3d at 1202; *Mohammed*, 400 F.3d at 798–99. In the cases before us—as in *A-T-*—the BIA failed to shift the burden to the government. Instead, the BIA stated conclusorily that the fact that petitioners had already undergone genital mutilation in and of itself rebutted the presumption that their lives or freedom would be threatened in the future, because, in its view, genital mutilation is a "one-time" act. *See* 24 I. & N. Dec. at 299–300. In so doing, the BIA committed two significant errors, which we address in turn below.

**1. The BIA Erred in Assuming Categorically that Female Genital Mutilation is a "One-Time" Act**

First, the BIA erred in stating categorically without citation to the record or relevant reports that female genital mutilation is a "one-time" act. *See A-T-*, 24 I. & N. Dec. at 299. A

recent BIA decision reveals the error. In *In re S-A-K- and H-A-H-*, 24 I. & N. Dec. 464 (B.I.A. 2008), where the BIA granted humanitarian asylum to two victims of past FGM, the BIA stated with respect to one applicant that "her vaginal opening was sewn shut [approximately five times] after being opened to allow for sexual intercourse and child birth." *Id*. With respect to the other applicant, it stated that her "vaginal opening was sewn shut with a thorn," so that "the man she was given to in marriage, who ultimately raped her, could not penetrate her for sexual intercourse. He was only able to rape her by cutting her open, causing her to bleed for many days." *Id*. As these examples illustrate, female genital mutilation is not necessarily a one time event. *See also, e.g.,, Bah*, 462 F.3d at 644 n.3 (Gibbons, J., concurring) ("In several cases asylum applicants have successfully produced evidence indicating a risk of further mutilation."); *Mohammed*, 400 F.3d at 800 ("[The Petitioner] might also be at risk of further genital mutilation."); *Tunis v. Gonzales*, 447 F.3d 547, 550 (7th Cir. 2006) (petitioner "fear[ed] that if . . . returned to Sierra Leone she w[ould] be forced to undergo the procedure again"). Although it is not petitioners' burden to show that the mutilation will be repeated, record evidence reveals that genital mutilation, such as infibulation, is often repeated in Guinea.

Accordingly, the BIA erred in stating categorically that genital mutilation could only be performed once, without placing the burden on the government to show that these particular petitioners are not at risk of further mutilation. *Cf., e.g., Tambadou v. Gonzales*, 446 F.3d 298, 303–04 (2d Cir. 2006) (stating that the BIA is required to perform an "individualized analysis" as to whether the presumption of fear of future persecution has been rebutted by a showing of changed circumstances); *Berishaj v. Ashcroft*, 378 F.3d 314, 327 (3d Cir. 2004) ("'[T]he [government] is obligated to introduce evidence that, on an individualized basis, rebuts a particular applicant's specific grounds for his well-founded fear of future persecution.'" (quoting

25

*Rios v. Ashcroft*, 287 F.3d 895, 901 (9th Cir. 2002))). Moreover, the BIA's assumption that mutilation is a "one-time" act, without citation to record evidence or country reports, amounted to impermissible speculation. *See Cao He Lin*, 428 F.3d at 405 (holding that "absent record evidence of practices in foreign countries, the [agency] must not speculate as to the existence or nature of such practices").

On remand, the agency must hold the government to its regulatory burden of showing, by a preponderance of the evidence, that petitioners would not be subject to further mutilation upon return to Guinea.

### 2. The BIA Erred in Failing to Consider Other Forms of Persecution

Second, the BIA erred in assuming that genital mutilation is the only type of persecution relevant to the analysis of whether petitioners merited withholding of removal. *See A-T-*, 24 I. & N. at 299 ("[T]he fact that FGM is generally performed only once . . . eliminat[es] the risk of *identical* future persecution.") (emphasis added). Nothing in the regulation suggests that the future threats to life or freedom must come in the same *form* or be the same *act* as the past persecution. The withholding regulation triggers a presumption that "the applicant's life or freedom would be threatened in the future . . . on the basis of the original claim." 8 C.F.R. § 1208.16(b)(1)(i). Thus, to rebut the regulatory presumption, the government must show that changed conditions obviate the risk to life or freedom related to the original claim, e.g., persecution on account of membership in her particular social group. It cannot satisfy its burden solely by showing that the particular act of persecution suffered by the victim in the past will not recur. *See Hassan*, 484 F.3d at 518 ("The government's argument erroneously assumes that FGM is the only form of persecution in Somalia and that having undergone the procedure, Hassan, as a Somali woman, is no longer at risk of other prevalent forms of persecution. We have never held

that a petitioner must fear the repetition of the exact harm that she has suffered in the past. Our definition of persecution is not that narrow.") (internal citations omitted); *Mohammed*, 400 F.3d at 800 ("The State Department Reports in the record make clear that the subordination and persecution of women in Somalia is not limited to genital mutilation."). As amicus argues, it would be incongruous to hold, for example, that the fact that an applicant's tongue was severed because he spoke out against the government in and of itself rebutted the presumption that his life or freedom would be threatened in the future simply because his tongue could not be cut off again. Indeed, having provided time to conduct the necessary research, we asked the parties to provide examples of any case outside the genital mutilation context where the BIA held that the presumption of fear of future persecution or threats to life or freedom had been rebutted simply by virtue of the fact that the exact same act of persecution—such as removal of a limb or organ—physically could not be repeated. The parties, not surprisingly, were unable to find any such case. Thus, there is no basis for denying withholding relief to victims of female genital mutilation simply because, as the BIA erroneously held, they may not be subject to the "risk of identical future persecution." *A-T-*, 24 I. & N. Dec. at 299.[21]

Apparently recognizing this error, the BIA in an unpublished and non-precedential opinion denying reconsideration in *A-T-*, conceded that Traore had made "a legitimate argument" that genital mutilation and forced marriage were inflicted on account of membership in the same

[21] As noted above, the BIA in *A-T-* rejected the Eighth Circuit's holding in *Hassan* as "at odds with the regulatory structure" for withholding of removal claims. In so doing, the BIA relied on 8 C.F.R. § 1208.16(b)(1)(iii), which provides that "[i]f the applicant's fear of future threat to life or freedom is unrelated to the past persecution, the applicant bears the burden of establishing that it is more likely than not that he or she would suffer such harm." Here, the record reveals that petitioners are potentially at risk of forms of persecution based on the same social group on account of which they were subject to genital mutilation. Thus, section 1208.16(b)(1)(iii) does not provide a basis for placing the burden on petitioners in these cases.

social group, and that "an asylum applicant could present a successful claim on a theory that FGM is a single type of harm in a series of injuries inflicted on account of one's membership in a particular social group," such that "she continues to have a well founded fear of future persecution based on the potential for related harm." Nevertheless, the BIA denied reconsideration, inexplicably concluding that Traore failed to "me[et] *her* burden" of showing that her life or freedom would be threatened in the future in this manner, and that she failed to "show[] that she could not reasonably relocate elsewhere in Mali to avoid the marriage." *In re Alima Traore*, No. A72 169 850 (B.I.A. Apr. 14, 2008) (emphasis added). The regulations clearly provide, however, that the burden is on the *government* to show that her life or freedom would *not* be threatened, or that she *could* safely relocate. 8 C.F.R. §§ 1208.16(b)(1)(i), (ii).

Here, the records below provide ample evidence that Guinean and/or Fulani women are routinely subjected to various forms of persecution and harm beyond genital mutilation. For example, the 2004 State Department Country Report on Human Rights Practices for Guinea states that "[d]omestic violence against women [is] common," and that "police rarely intervene[] in domestic disputes." *Id*. at 9. Moreover, the report states that women in Guinea are commonly subject, without recourse, to crimes such as rape and sex trafficking. *Id*. at 10. The government in these cases did not even attempt to argue that petitioners would not be subject to forms of persecution other than genital mutilation on account of their membership in particular social groups upon return to Guinea.

Under the regulations, once the petitioners established past persecution on account of a protected ground in the form of female genital mutilation, it should have been presumed that their lives or freedom would be threatened in the future. By failing to require the government to show, by a preponderance of the evidence, that petitioners would not endure further mutilation or

28

other threats to their lives or freedom upon return, the BIA turned the presumption on its head. The agency must, on remand, hold the government to its regulatory burden.

Because we find that the case must be remanded based on the errors identified above, we do not reach the issue of whether the agency also erred in declining to apply its "continuing persecution" reasoning to claims based on female genital mutilation.[22]

## CONCLUSION

In sum, we find that the BIA erred in its application of the withholding of removal regulatory framework to female genital mutilation claims. We accordingly decline to adopt the reasoning and holding of *A-T-* in our Circuit, and the cases before us must therefore be remanded to the BIA. "To the extent there is a need for further development of the factual record[s], a task outside the scope of the BIA's authority, *see* 8 C.F.R. §§ 1003.1(d)(3)(i), (iv), we instruct that on remand, the BIA send th[ese] case[s] to an IJ for further findings of fact." *Delgado v. Mukasey*, 508 F.3d 702, 708 (2d Cir. 2007). *See also Gui Yin Liu v. INS*, 508 F.3d 716, 723 (2d Cir. 2007)

---

[22] All three petitioners also argue before this Court that they should be granted withholding of removal based on their fears that their daughters (or potential daughters) will be subject to genital mutilation should they be forced to return to Guinea; however, each petitioner failed to raise this argument in her brief to the BIA. Accordingly, as these arguments are unexhausted, we will not consider them. *See* 8 U.S.C. § 1252(d)(1); *Lin Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 121–22, 124 (2d Cir. 2007) (holding that issue exhaustion is mandatory, even if not a statutory jurisdictional requirement). Although Mariama briefly raised the fact that her daughters might be subject to genital mutilation upon return to Guinea in her brief to the BIA, she did so only in relation to her cancellation of removal claim, and the BIA addressed the issue only with respect to that claim. Any such argument in relation to her withholding of removal claim is therefore unexhausted, and her cancellation of removal claim is addressed in the separately filed summary order. Moreover, each petitioner failed to meaningfully argue before this Court or the BIA any claim for CAT relief based on genital mutilation. Accordingly, we deem any such argument unexhausted and waived. *Lin Zhong*, 480 F.3d at 121–22; *Yueqing Zhang v. Gonzales*, 426 F.3d 540, 541 n.1, 545 n.7 (2d Cir. 2005). These portions of the petitions for review must therefore be dismissed. The BIA is, of course, free to consider these claims on remand.

29

(per curiam) (remanding to the BIA with instructions to remand to the IJ "if necessary" to further develop factual record).

For the foregoing reasons, the petitions for review are GRANTED in part and DISMISSED in part with respect to the claims relating to female genital mutilation. Other portions of the petitions for review are DENIED in part and DISMISSED in part for the reasons set forth in a separately filed summary order. The decisions of the BIA are VACATED, and the cases are REMANDED to the BIA for proceedings consistent with this opinion.

STRAUB, *Circuit Judge*, concurring:

I write separately because, although my colleagues believe we need not reach the issue of whether the BIA erred in declining to apply its "continuing persecution" reasoning in the genital mutilation context, I believe it prudent to decide the issue, as it provides petitioners with another potential avenue for relief.[1] For the reasons that follow, I conclude that even assuming the government had met its burden of demonstrating that the petitioners will not be subject to further mutilation or other related threats to their lives or freedom in the future, the BIA erred in failing to recognize female genital mutilation as a form of continuing persecution.

## I. Forced Sterilization and *Y-T-L-*

In *In re Y-T-L-*, 23 I. & N. Dec. 601 (B.I.A. 2003) (en banc), the BIA, assessing the asylum application of an applicant fleeing China due to its "one child" policy, held that even though forced sterilization was an act of persecution that would not be repeated, the fact that the act had occurred in the past could not in and of itself be used to rebut the presumption of a fear of future persecution because forced sterilization, unlike most other forms of persecution, constituted continuing persecution. *Id.* at 605. I conclude that the BIA erred in failing to treat female genital mutilation in the same manner, but in order to more fully explain my reasoning, some background as to the evolution of the assessment of forced sterilization claims is necessary.

---

[1] In particular, I note that the two bases for remand identified in the majority opinion are not necessarily determinative of the outcome of petitioners' applications. *Cf., e.g., Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) ("Because this Court finds the first two issues dispositive, it does not reach the third issue."). *See also Vumi v. Gonzales*, 502 F.3d 150, 156 (2d Cir. 2007) ("It bears underscoring that the BIA must apply the correct standard on remand . . . ."). Moreover, all parties and amicus have exhaustively briefed this issue. *Cf., e.g., LNC Invs., Inc. v. First Fid. Bank, N.A*, 173 F.3d 454, 468 (2d Cir. 1999) ("Our decision not to reach this issue on the merits is reinforced by the fact that it has not been adequately briefed and argued before this Court.").

Initially, in *In re Chang*, 20 I. & N. Dec. 38 (B.I.A. 1989), *superseded by statute as stated in Guan Shan Liao v. U.S. Dep't of Justice*, 293 F.3d 61, 65 (2d Cir. 2002), the BIA held that forced sterilization did not constitute persecution on account of any of the protected grounds. *Id.* at 44. *See also In re G-*, 20 I. & N. Dec. 764, 775 (B.I.A. 1993) ("[W]e remain of the opinion that our interpretation of the law regarding China's one couple, one child policy articulated in *Matter of Chang* is legally correct . . . .") (citation omitted). In so holding, the BIA in *Chang* explicitly highlighted the need for congressional action as to this issue. *See* 20 I. & N. Dec. at 47 ("Whether [China's population control] policies are such that the immigration laws should be amended to provide temporary or permanent relief from deportation to all individuals who face the possibility of forced sterilization as part of a country's population control program is a matter for Congress to resolve legislatively."). In response, Congress amended the INA as follows:

> [A] person who has been forced . . . to undergo involuntary sterilization . . . shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure . . . shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C. § 1101(a)(42). At the time Congress enacted this amendment, the regulations provided that the presumption of a well founded fear of future persecution could only be rebutted by changed country conditions. *See* 8 C.F.R. § 208.13(b)(1)(i) (1997). Accordingly, the fact that a person had been forcibly sterilized in the past could not, in and of itself, be used to rebut the presumption of fear of future persecution. In 2000, however, the regulation was amended to provide that any fundamental change in circumstances could be used to rebut the presumption. *See* 8 C.F.R. § 1208.13(b)(1)(i); 65 Fed. Reg. 76121-01 (Dec. 6, 2000).

In *Y-T-L-*, the BIA, acting en banc, applied the new regulatory framework to a case involving past forced sterilization. The BIA stated that "the [applicant] has no reasonable basis to

2

fear [forced sterilization] in the future, based on the very fact that he has already been persecuted," and that, as a result, under the new regulatory scheme, the presumption of fear of future persecution might be viewed as having been rebutted. 23 I. & N. Dec. at 606. However, the BIA, emphasizing "the special nature of the persecution at issue here," as well as Congress's intent in defining forced sterilization as persecution on account of political opinion, held that the fact that an applicant had been forcibly sterilized in the past could not itself be used to rebut the presumption of a fear of future persecution. *Id*. at 605–07. Specifically, the BIA reasoned:

> The Immigration Judge's conclusion fails to take into account the continuing nature of the persecution inflicted on the respondent and his wife. Moreover, the principal reason that the respondent and his wife no longer fear a coerced sterilization or abortion, or future fines for "over-birth," is the fact that they have been rendered incapable of having children. *Thus, the Immigration Judge's rationale could lead to the anomalous result that the act of persecution itself would also constitute the change in circumstances that would result in the denial of asylum to persons such as the respondent.*[2]

---

[2] To the extent that the BIA by these words is interpreting the regulations as a general matter to prohibit an act of persecution itself from being the "fundamental change in circumstances" that rebuts the presumption of fear of future persecution or threats to life or freedom, I agree. The regulations specifically provide that once past persecution is established, it takes a showing of a "fundamental *change* in circumstances" to rebut the presumption. 8 C.F.R. §§ 1208.13(b)(1)(i)(A), 1208.16(b)(1)(i)(A) (emphasis added). It stands to reason that the "change" contemplated by the regulations must have occurred since the past persecution occurred; otherwise, the "fundamental change in circumstances" portion of the regulations would be superfluous; the regulations could merely have provided that the presumption could be rebutted by a showing that the applicant would not be persecuted in the future or that the applicant's life or freedom would no longer be threatened in the future. As the authoring member of *A-T-* noted in his dissent in *Y-T-L-*, such language was indeed proposed, but the "fundamental change in circumstances" language was adopted so as to account for those individuals whose affected group did not fear future persecution but who had themselves experienced past persecution. *See Y-T-L-*, 23 I. & N. Dec. at 617 (Filppu, Board Member, dissenting). Because it is not clear whether the BIA indeed intended to express such an interpretation, I do not rest my concurrence on this ground. *Cf. Delgado v. Mukasey*, 516 F.3d 65, 69 (2d Cir. 2008) ("[W]e give 'substantial deference' to BIA decisions interpreting immigration regulations."). I note, however, that the BIA did not address this possible interpretation of the regulations in the present cases or in *A-T-*, even though it is potentially determinative of the issue at hand, and I would encourage the BIA to do so on remand.

3

*Id*. at 605 (emphasis added). The BIA further reasoned that "[t]he act of forced sterilization should not be viewed as a discrete, onetime act, comparable to a term in prison, or an incident of severe beating or even torture." *Id*. at 607. Instead, forced sterilization is "better viewed as a permanent and continuing act of persecution." *Id*. Accordingly, the BIA granted the application for asylum, holding that "the regulatory presumption of a well-founded fear of persecution arising from such past persecution has not been rebutted." *Id*. at 607–08.[3]

The agency's understanding of certain types of persecution as constituting continuing persecution is consistent with the language of the regulations. *See Zhen Nan Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 262 (2d Cir. 2006); *Qili Qu v. Gonzales*, 399 F.3d 1195, 1203 (9th Cir. 2005). The BIA, acting within the regulatory framework, reasonably determined that the fact that an individual had already undergone forced sterilization could not itself rebut the presumption of a fear of future persecution because, unlike other types of persecution, the act of forced sterilization is "permanent and continuing." *Y-T-L-*, 23 I. & N. Dec. at 607. That is to say, even though the actual act of forced sterilization occurred in the past, the act continues to "deprive[] a couple of the natural fruits of conjugal life, and the society and comfort of the child or children that might eventually have been born to them." *Id*. Unlike most other types of persecution, such as "a term in prison, or an incident of severe beating or even torture," *id*., forced sterilization is performed once because it *need* only be performed once: it is for life. It stands to reason that if an

---

[3] I note that in *Y-T-L-*, it was the applicant's wife—as opposed to the applicant himself—who had been sterilized. We subsequently held in *Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296 (2d Cir. 2007) (en banc), that applicants could not obtain asylum based solely on the forced sterilization of their partners, *id*. at 300, and recently, the Attorney General came to this same conclusion in a published opinion, *In re J-S-*, 24 I. & N. Dec. 520 (A.G. 2008). But these decisions did nothing to alter the basic holding of *Y-T-L-*—that past forced sterilization cannot in and of itself be used to rebut the presumption of fear of future persecution because the persecution is "continuing."

4

applicant continues to be persecuted into the future, the presumption that the applicant's life or freedom would be threatened in the future cannot be rebutted.

## II. Application of the "Continuing Persecution" Reasoning to the Female Genital Mutilation Context

Because female genital mutilation, like forced sterilization, is a continuing act of persecution that, at a minimum, permanently deprives a woman of certain aspects of her sexuality, it follows that, like forced sterilization, the act of mutilation itself could not rebut the presumption that the applicant's life or freedom would be threatened in the future.[4] *See Mohammed v. Gonzales*, 400 F.3d 785, 799 n.22 (9th Cir. 2005) ("[T]he principle that the fact of sterilization cannot be used by the government to rebut the fear of future harm was developed by the BIA . . . as a recognition of the special, continuing, and permanent nature of coercive population control. . . . [T]he reasoning in the forced sterilization cases would appear to apply equally to the case of genital mutilation.").

Since the day after it issued its decision in *Y-T-L-* on May 22, 2003, the BIA has, on numerous occasions in unpublished decisions, granted asylum or withholding of removal to victims of genital mutilation based on the finding that female genital mutilation is a continuing

---

[4] My colleague attempts to distinguish these cases from *Y-T-L-* by noting that withholding of removal "is a form of relief that by statute is prospective looking only." However, this observation does nothing to distinguish *Y-T-L-*, where the BIA also noted that asylum is a "prospective" form of relief. 23 I. & N. Dec. at 606 ("[T]his prospective view is not only unobjectionable, but is a bedrock principle of refugee law . . . ."). Indeed, the asylum regulations provide that the only way an asylum applicant can be granted asylum based on the past persecution alone is based on the severity of the past persecution, *see* 8 C.F.R. § 1208.13(b)(1)(iii)(A), but the BIA was not operating under this regulation in *Y-T-L-*. The BIA was operating only within the parameters of the forward-looking portion of the asylum framework, and it satisfied the provisions of that framework by reasoning that forced sterilization was a form of persecution that continued on into the future. Accordingly, for the reasons set forth below, this reasoning applies with equal force in the context of withholding of removal claims based on female genital mutilation.

5

form of persecution. *See, e.g.*, *In re Bosede Olawumi*, No. A70 651 629 (B.I.A. May 23, 2003) (per curiam) ("Forced female genital mutilation is better viewed as a permanent and continuing act of persecution that has permanently removed from a woman a physical part of her body, deprived her of the chance for sexual enjoyment as a result of such removal, and has forced her to [sic] potential medical problems relating to this removal."); *In re Mariama Dalanda Bah*, No. A97 166 217 (B.I.A. Sept. 1, 2005) (per curiam) ("The persecution resulting from FGM is therefore continuing and permanent. Considering the continuing effects of such persecution, we find that the presumption of future harm has not been adequately rebutted simply because the procedure may not be repeated on the [applicant]."); *In re Aisatou Sillah*, No. A72 784 955 (B.I.A. Nov. 7, 2005) ("[T]he [IJ] observed in his decisions that the [applicant], who had been subjected to FGM, had suffered past persecution on account of a protected ground. The [IJ] noted that there was no indication that the effects of her persecution would dissipate and may be taken as permanent. . . . We find that the [IJ]'s observations are fully consistent with our decision in *Matter of Y-T-L-*.") (citations omitted). Nevertheless, in September 2007, the BIA issued *In re A-T-*, 24 I. & N. Dec. 296 (B.I.A. 2007), in which it reversed course and held that female genital mutilation was not a continuing form of persecution.[5] In so holding, the BIA in my view committed several errors in reasoning.

First, in *A-T-*, the BIA reasoned that it "treated sterilization as continuing persecution [in *Y-T-L-*] because it would have contradicted Congress's purpose to find that the very act that constituted persecution under the coerced population control provisions was itself a 'fundamental

---

[5] The BIA apparently, for some unspecified period in advance of *A-T-*, began issuing unpublished decisions, such as the ones before us now, advancing the reasoning which later appeared in *A-T-*.

6

change in circumstances' that obviated a future well-founded fear." *A-T-*, 24 I. & N. Dec. at 300 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(A)). This was because, in the BIA's view, unlike victims of genital mutilation, "[t]he statute defined victims of forced sterilization . . . as qualifying for relief." *Id*. But the fact that Congress specifically defined forced sterilization as persecution does nothing to meaningfully distinguish it from female genital mutilation, which, as set forth in the majority opinion, has been found to constitute persecution by the BIA and the vast majority of the courts of appeals.

In *Y-T-L-*, the BIA itself noted that Congress's purpose in amending section 1101(a)(42) was to supersede prior BIA decisions that had held that forced sterilization did not constitute persecution on account of a protected ground. *See* 23 I. & N. Dec. at 603–04, 607 ("The principal issue of contention . . . was whether such harm was on account of a ground protected under the Act. Congress has definitively answered that question . . . .") (internal citations omitted). The legislative history of the amendment confirms the this notion. *See, e.g.*, H.R. Rep. No. 104-469(I) at 173-74, 1996 WL 168955 (1996) ("The primary intent of [the amendment] is to overturn several decisions of the Board of Immigration Appeals, principally *Matter of Chang* and *Matter of G-*. . . . Nothing in [the amendment] is intended to lower the evidentiary burden of proof for any alien, no matter how serious the nature of the claim."). Congress, in effect, did for forced sterilization claims what the BIA did in *In re Kasinga*, 21 I. & N. Dec. 357 (B.I.A. 1996) (en banc)*,* for genital mutilation claims: it provided for basic qualification for asylum and withholding of removal by defining forced sterilization as persecution on account of one of the protected grounds, without altering the regulatory framework for assessing such claims.[6] *See Shi*

---

[6] Although the BIA's unpublished decisions are not precedential, *see Ajdin v. BCIS*, 437 F.3d 261, 264–65 (2d Cir. 2006) (per curiam), I note in passing that this conclusion is supported

*Liang Lin*, 494 F.3d at 309 ("Congress has relieved . . . persons who actually experienced, or are threatened with, a forcible abortion or sterilization from the burden of proving a political nexus in their particular cases."). Thus, the reasoning of *Y-T-L-*—that it would be "anomalous" under the statutory and regulatory framework to allow the "act of persecution itself [to] constitute the change in circumstances that would result in the denial of asylum," 23 I. & N. Dec. at 605—applies with equal force in the forced sterilization and female genital mutilation contexts. Accordingly, in my view, the BIA's attempt in *A-T-* to distinguish the two contexts in this manner fails.[7] *See Fox Television Stations, Inc. v. Fed. Commc'ns Comm'n*, 489 F.3d 444, 456

by the fact that immediately following the issuance of *Y-T-L-*, the BIA, even in three-member decisions, began applying the "continuing persecution" reasoning in FGM cases without distinguishing the two contexts based on the amendment.

[7] To the extent that the BIA in *A-T-* now attempts to distinguish the two contexts on the ground that the amendment provides automatic relief to forced sterilization victims, such an interpretation is belied by the reasoning and holding of *Y-T-L-*. The BIA in *Y-T-L-* determined *how* to apply the new regulatory framework to forced sterilization cases, not that it need not apply it at all. But if the BIA in *Y-T-L-* had truly interpreted the statute as conferring per se relief to anyone who had suffered forced sterilization in the past, the "continuing persecution" reasoning would not be necessary because such cases would not be subject to the burden shifting regulations. *See Mohammed*, 400 F.3d at 799 n.22. Indeed, the authoring member of *A-T-* noted as much in his dissent in *Y-T-L-*, which was joined by yet another member on *A-T-*. *See Y-T-L-*, 23 I. & N. Dec. at 613 (Filppu, Board Member, dissenting) ("The majority is correct that the statute equates persecution arising from a coercive population control program as being persecution 'on account of political opinion.' The statute, however, does not direct that persons suffering such persecution be exempt from the normal rules that apply to all persons who have suffered past persecution on account of political opinion but who lack a reasonable fear of future persecution."). To the extent applicants now receive relief based on the past act of forced sterilization alone, it is because of the reasoning set forth in *Y-T-L-*, namely that the persecution is continuing and thus a fear of future persecution cannot be rebutted. *See Xue Hong Yang v. U.S. Dep't of Justice*, 426 F.3d 520, 522 (2d Cir. 2005) ("The BIA has held that forced sterilization constitutes a form of permanent and continuing persecution that qualifies an alien for asylum under the INA.") (citing *Y-T-L-*, 23 I. & N. Dec. at 606–07); *Li Yong Cao v. U.S. Dep't of Justice*, 421 F.3d 149, 155–56 (2d Cir. 2005) ("The BIA has held that because the persecution of forcible sterilization or abortion is 'permanent and continuous,' it inherently generates an irrebuttable presumption of a well-founded fear of future persecution.") (citing *Y-T-L-*, 23 I. & N. Dec. at 605–08).

(2d Cir. 2007) ("[Agencies] must provide a reasoned analysis for departing from prior precedent."), *cert. granted*, 128 S. Ct. 1647 (2008); *Ke Zhen Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 95 (2d Cir. 2001) ("[A]pplication of agency standards in a plainly inconsistent manner across similar situations evinces such a lack of rationality as to be arbitrary and capricious."); *cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("[I]f the agency *adequately explains* the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.") (internal quotation marks omitted) (emphasis added).

Like forced sterilization and unlike most other types of persecution, female genital mutilation continues to persecute its victims well beyond the initial act of mutilation. In *In re Acosta*, 19 I. & N. Dec. 211 (B.I.A. 1985), *overruled in part on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (B.I.A. 1987), in which the BIA for the first time announced parameters for the statutory term "particular social group," the BIA stated that the purpose of persecution is to "punish [an individual] for possessing a belief or characteristic a persecutor seeks to overcome." *Id.* at 223. In *Kasinga*, the BIA affirmed that genital mutilation fulfills this purpose, because "FGM is practiced, at least in some significant part, to overcome sexual characteristics of young women." 21 I. & N. Dec. at 367. *See also Mohammed*, 400 F.3d at 798. In particular, as stated above, female genital mutilation is often performed in order to eliminate sexual pleasure in its victims, *see, e.g.*, *Abay v. Ashcroft*, 368 F.3d 634, 638 (6th Cir. 2004); *Abankwah v. INS*, 185 F.3d 18, 23 (2d Cir. 1999), in order to ensure the victim's fidelity in

Moreover, even if the BIA were correct in stating that the statute itself provides for per se relief in the forced sterilization context based on "the past harm alone," *A-T-*, 24 I. & N. Dec. at 300, for the reasons set forth below, it would still be reasonable to apply the "continuing persecution" reasoning in the female genital mutilation context.

marriage, *see*, *e.g.*, *Niang v. Gonzales*, 422 F.3d 1187, 1192 (10th Cir. 2005), or to prevent the victim from or punish her for engaging in premarital sex, *see*, *e.g.*, *Abay*, 368 F.3d at 644 (Sutton, J., concurring); *Abankwah*, 185 F.3d at 20. In the cases before us, petitioners testified that as a result of the genital mutilation they suffered, they continue either to feel no pleasure or to experience pain during intercourse.

The BIA—in the present cases and in *A-T-*—again attempts to distinguish female genital mutilation from forced sterilization, stating that it is more analogous to other "lasting disabilit[ies], such as the loss of a limb," *A-T-*, 24 I. & N. Dec. at 300, and reasoning, "[t]he loss of a limb also gives rise to enduring harm to the victim, but such forms of past persecution are routinely assessed under the past persecution standards specified in the asylum and withholding of removal regulations," *id*. at 301.[8] But the BIA conveniently stops short of taking this analogy to its logical conclusion. The loss of a limb or organ on account of a protected ground could never, in and of itself, be used to rebut a fear of future persecution or threats to life or freedom.[9] Indeed, as noted in the majority opinion, the parties have been unable to point us to a single instance outside the genital mutilation context where the BIA has accepted such an argument.

More importantly, in advancing this analogy, the BIA conflates continuing *persecution* with continuing *harm*. *Compare Y-T-L-*, 23 I. & N. Dec. at 607 (forced sterilization is viewed as a "permanent and continuing act of persecution"), *with A-T-*, 24 I. & N. Dec. at 299–300 (stating

---

[8] Similarly, in the cases before us, the BIA analogized genital mutilation to the loss of "a bodily organ."

[9] *See Diallo v. Mukasey*, No. 06-4445, 2008 WL 508622, at *11 (6th Cir. Feb. 25, 2008) (Moore, J., dissenting) ("We would not take seriously the argument that someone who lost a limb in the course of persecution on account of his social-group membership categorically could not establish a well-founded fear of future persecution only because he could not again lose that same limb.").

that female genital mutilation is a "continuing harm" that "has ongoing physical and emotional effects"). While the loss of a limb or organ undoubtedly carries with it lasting physical effects and continuing harm, the physical effects and harm will rarely be directly related to the protected ground on account of which the victim was persecuted. In contrast, in the genital mutilation context, as in the forced sterilization context, the *form* of persecution itself—and consequently the harm suffered by the victim—is directly related to the victim's protected group and the "characteristic[s] [the] persecutor seeks to overcome," *Acosta*, 19 I. & N. Dec. at 223, i.e., in the forced sterilization context, the ability to have children, and in the genital mutilation context, the woman's "sexual characteristics," *Kasinga*, 21 I. & N. Dec. at 367. As substantiated by petitioners' testimony—including that they will for life be unable to experience pleasure from intercourse—and record evidence, at least some of the "sexual characteristics" of victims of female genital mutilation are suppressed by the act of mutilation itself and will continue to be suppressed for the rest of their lives as a result of the act. In contrast, victims of most other types of persecution may experience lasting effects or harm resulting from the persecution, but the characteristics their persecutors "seek[] to overcome" will not have been suppressed or overcome for life based solely on the method of persecution. Thus, even accepting as true the BIA's unfounded assertion that genital mutilation is only performed once, like forced sterilization and unlike most other forms of persecution (including those with lasting adverse effects), it is only performed once because it *need* only be performed once: even after the initial act of mutilation, the persecution endures.[10] Accordingly, just as in the forced sterilization context, it stands to

_____

[10] This distinction obviates the concern hinted at in my colleague's concurrence that all cases "where ongoing physical or emotional harm from a prior persecutory act is alleged" would have to be granted under the "continuing persecution" reasoning. In order to invoke the "continuing persecution" reasoning in other contexts, victims of past persecution would have to

11

reason that because a victim of female genital mutilation continues to be persecuted into the future, the presumption that her life or freedom will be threatened in the future on account of one of the protected grounds cannot be rebutted.[11]

* * *

In sum, although I agree with my colleagues that the errors identified in the majority opinion themselves require remand, I would further hold that the BIA erred in failing to recognize female genital mutilation as continuing persecution because (1) the "continuing persecution" reasoning, which has been fully briefed and argued by all parties and amicus, provides petitioners with another potential avenue for relief; (2) the agency's understanding of certain types of persecution, such as forced sterilization, as constituting continuing persecution is consistent with the regulatory framework for asylum and withholding of removal; and (3) the BIA's attempt to distinguish female genital mutilation from forced sterilization does not withstand scrutiny.

I conclude by expressing my strong disapproval of the actions of the BIA in these cases. The BIA in the cases before us and in *A-T-* has attempted (unsuccessfully, in my opinion) to limit the reasoning and holding of *Y-T-L-* to the forced sterilization context. In so doing, as set forth in

---

show that they continued to be *persecuted*—not merely *harmed*—as a result of the form of persecution, that is to say, their particular "characteristic[s]" that their persecutors sought "to overcome" continue to be suppressed or overcome into the future as a result of the method of past persecution. Such a showing will be impossible in most cases outside the forced sterilization and female genital mutilation contexts.

[11] I am mindful of the fact that the continuing persecution that results from genital mutilation would occur regardless of whether the applicant was located in this country or in her home country; however, this fact does not serve to distinguish genital mutilation from forced sterilization. Moreover, there are obvious concerns with sending a person who continues to be persecuted to live among her persecutors.

our majority opinion, it has failed even to treat claims based on female genital mutilation as it would (and should) claims based on any other type of persecution. The BIA refers, in passing, to the act of female genital mutilation as "reprehensible," *Matter of A-T-*, 24 I. & N. Dec. at 299, but its entirely dismissive treatment of such claims in these cases belies any sentiment to that effect. I am aware of the limited resources available to the agency in adjudicating its cases, *see*, *e.g.*, *Kadia v. Gonzales*, 501 F.3d 817, 820–21 (7th Cir. 2007); however, despite difficulties that may be presented by a lack of time or staffing, the BIA is expected to adequately fulfill its adjudicatory role by "exercis[ing] care commensurate with the stakes" in cases such as these. *Id.* at 821. As set forth in the majority opinion, and as the BIA and the vast majority of the courts of appeals have recognized, female genital mutilation is a horrendous act of persecution that can have serious, life-long consequences. Victims of this practice, such as the petitioners before us, are, at the very minimum, entitled to careful analysis as to whether they qualify for relief under the statutory and regulatory framework for asylum and withholding of removal claims. On this score, the agency has simply failed.

SOTOMAYOR, *Circuit Judge*, concurring:

I fully join the majority opinion. I write separately only to note that I do not necessarily agree with my colleague's analysis or conclusions in his concurring opinion on the issue of "continuing persecution," and to further explain why I think it is imprudent for us to rule on the matter at this time. Withholding of removal is a form of relief that by statute is prospective looking only. 8 U.S.C. § 1231(b)(3)(A). It is only by regulation that a finding of past persecution gives rise to a presumption of a future threat to life or freedom for purposes of withholding of removal eligibility. 8 C.F.R. § 1208.16(b)(1)(i). Thus, in the event that the government is able on remand to satisfy its burden of proving the unlikelihood of a future threat to petitioners' life or freedom upon their return to Guinea, I cannot say at this time that it would be impermissible for the agency to deem petitioners ineligible for withholding relief. *Cf. Auer v. Robbins*, 519 U.S. 452, 461 (1997) (substantial deference owed to agency's interpretation of its own regulation unless the interpretation is "plainly erroneous or inconsistent with the regulation") (internal quotation marks and citation omitted). However, because deciding the continuing persecution issue is (i) unnecessary to our disposition of these tandem cases, (ii) may never need to be decided after our instructions on remand are complied with, and (iii) could have far reaching implications in other types of cases where ongoing physical or emotional harm from a prior persecutory act is alleged, I think it is imprudent for us now to decide the issue one way or the other.