# MATTER OF CHANG

## In Deportation Proceedings

### A-27202715

### *Decided by Board May 12, 1989*

(1) Implementation of the one couple, one child policy of the Chinese Government is not on its face persecutive and does not create a well-founded fear of persecution on account of one of the five reasons enumerated in section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (1982), even to the extent that involuntary sterilizations may occur.

(2) An individual claiming asylum for reasons related to the one couple, one child policy must establish that the application of the policy to him was in fact persecutive or that he had a well-founded fear that it would be persecutive because the policy was being selectively applied against members of a particular religious group or was being used to punish individuals for their political opinions or for other reasons enumerated under section 101(a)(42)(A) of the Act.

(3) A person who shows that he opposed the one couple, one child policy but was subjected to it nevertheless has not demonstrated that he was being punished for his opinion as a member of a particular social group (persons opposed to the policy), but rather, there must be evidence that the governmental action arose for a reason other than general population control (for instance, evidence of disparate, more severe treatment for those who publicly oppose the policy).

(4) If the applicant claims that action occurred at the hands of local officials, he must normally show that redress from higher officials was unavailable or that he has a well-founded fear that it would be unavailable.

(5) The policy guidelines announced by Attorney General Meese on August 5, 1988, regarding the one couple, one child policy do not apply to decisions by immigration judges and the Board of Immigration Appeals.

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Entered without inspection

ON BEHALF OF RESPONDENT:
Lebenkoff & Coven
505 Fifth Avenue
New York, New York 10017

ON BEHALF OF SERVICE:
Jill H. Dufresne
Deputy Chief Legal
Officer

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated December 18, 1986, the immigration judge found the respondent deportable on the charge set forth above and

denied his applications for asylum, withholding of deportation, and voluntary departure. The respondent has appealed from the denial of those applications. The appeal will be dismissed, except insofar as it concerns the denial of voluntary departure. The request for oral argument is denied.

With respect to his applications for asylum and withholding of deportation under sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982), the respondent, a 33-year-old native and citizen of the People's Republic of China, made the following assertions. In his application for asylum, the respondent indicated that he was an anti-Communist who fled his homeland "because of Communist domination of China"; that he did not base his asylum claim on conditions in China that affected his freedom more than the rest of the country's population; and that neither he nor any member of his immediate family had "ever been mistreated by the authorities of his home country." His asylum application did not reference any claim to asylum based on his country's population control measures and he did not allege any mistreatment arising from such policies.

At his deportation hearing, the respondent testified that he was afraid of persecution in China; that people there were "mobilized" and "forced to do the bidding of the government"; that he and his wife were not given any work to do; that he and his wife were forced to flee from their commune because they had two children and did not agree to stop having more children; and, that they disagreed with China's family planning policies because "in the countryside, especially in the farming areas, we need more children." He indicated that the "government" wanted him to go to a clinic to be sterilized, that he thought the operation would "harm" his body, that he did not want to be sterilized, and that if he returned to China he would be forced to submit to the operation. He testified that his wife was supposed to go to the clinic but did not do so because she was ill. He testified that he did not know what would have happened if his wife had gone to the clinic. He further testified that he did not mention his opposition to China's birth control policies on his asylum application because "nobody had asked [him]" and because he was not very "conversant" in expressing himself and did not understand English.

On appeal, the respondent, through counsel, states that the facts of the case are that he and his wife were ordered by their commune to submit to sterilization operations after the birth of their second child, that his wife was able to "postpone" the operation due to illness, but that he fled China because he had no choice other than to submit to the surgery.

In conjunction with the appeal, the respondent also submitted a

letter from the Library of Congress dated November 23, 1987, transmitting to the Immigration and Naturalization Service a report entitled "Population Control in the People's Republic of China." The report was apparently requested by the Service in connection with another matter.[1] According to the report, the People's Republic of China ("PRC") has no national law on population control per se. The constitution provides that the state shall carry out family planning to control the size of the population and that spouses have the duty to carry out family planning. The Marriage Law of 1980 sets minimum marriage ages and places responsibility for birth control on both partners. The provinces and the cities governed directly by the state have enacted their own regulations on population control, but the population control program is guided by a joint directive of the Chinese Communist Party and the state entitled "On the Further Implementation of Family Planning Work" of February 1982. The policy provides that state cadres and urban residents are allowed one child per couple, with exceptions when special permission is granted. In rural areas generally the one-child rule is applied, except that where there are special difficulties, such as the birth of a handicapped child who cannot work, application to have a second child can be made. In no case is a third birth to be permitted. The rules are more leniently applied to families of non-Han ethnic minority groups. Late in 1985, it was announced that the one-child rule would be relaxed, and that in some areas a second child would be permitted if the first was a girl and in other special circumstances. The mechanics of the implementation of the program are by and large locally determined. Economic sanctions, peer pressure, and propaganda are used to insure compliance. Single child families receive health and educational benefits for the child. Couples who continue pregnancies which are not allowed may suffer the suspension of wages, fines, loss of seniority for promotion, and so forth. Couples are urged to undergo birth control operations (sterilization). Wages are sometimes paid during a rest period after sterilization, and cash rewards have been used to encourage sterilization. The Chinese Government has consistently denied supporting any use of force to obtain compliance with birth quotas. The transmittal letter forwarding the report states that punishment in the form of a sterilization operation is not provided for

---

[1] Counsel for the respondent states that the Service is aware of this report. The sources cited in the report were not furnished to the Board in connection with this appeal and it is not known whether they were furnished to the Service by the Library of Congress. The Service, however, has not objected to consideration of this report. On appeal, respondent has also referenced newspaper articles and various other non-legal sources which were not offered into evidence at the hearing and whose texts have not been made available to this Board. These latter sources will not be considered.

in Chinese law, though local officials may have used the one-child campaign to carry out a private vendetta.

Counsel also relies on the 1985 and 1987 Country Reports on Human Rights Practices, Joint Committee of the Senate and the House of Representatives, 99th Congress, 2d Session (1986), and 100th Congress, 2d Session (1988) ("Country Reports"), respectively. The 1985 Country Report on the PRC indicates that

> [r]eported instances of family planning malpractice occur mostly in rural areas, where local officials have sometimes translated the policy into rigid quotas. Chinese authorities say they take measures against local officials who violate the Government's policy in this regard, but there have been few reports of punishment of such offenders.

1985 Country Reports at 741. According to the 1987 report, provinces are allowed to make their own regulations regarding implementation of the one-child policy as long as overall birthrates match the state-imposed goals. In the past, local officials coerced significant numbers of women into having abortions. In 1987 the Chinese Government stressed repeatedly that it does not condone forced abortions or sterilizations. Chinese authorities have said that they take measures against local officials who violate the Government's policy. Despite central government efforts to prevent the imposition of rigid quotas, local government officials and peers reportedly continue to exert pressure on some persons seeking to have second children. Economic pressure on families with more than two children can be severe and can include loss of party membership, loss of job, difficulty in purchasing state-supplied seed, fertilizer, and fuel and other sanctions. 1987 Country Reports at 666.[2]

---

[2] In addition to the excerpts quoted by the respondent, we note the following relevant excerpts from the Country Reports on the PRC: .

> Implementation [of the family planning program] has varied widely from place to place. Although coercive family planning is contrary to official Chinese policy, there have been numerous reliable reports of coercive birth control practices, including forced abortions and sterilization....

1985 Country Reports at 738.

> Extensive regulation of individual and family life is one of the distinctive features of the Chinese sociopolitical system. For most Chinese (particularly urban residents), life revolves around the work unit, which provides not only employment, but also housing, ration coupons, permission to marry and have a child, and other aspects of ordinary life....

> *Faced with one-fifth of the world's population squeezed onto 7 percent of the world's arable land, China's leaders have made family planning a top national priority.* They believe that economic modernization goals will be unattainable without a low birth rate, particularly given the current high number of females of childbearing age, traditionally high Chinese birth rates, and recent medical advances leading to longer life expectancies. To achieve its goal of limiting China's population to 1.2 billion in the year 2000, the Government is discouraging early marriage and promoting as an

An applicant for asylum must establish that he was persecuted, or that a reasonable person in his circumstances would fear persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* sections 101(a)(42)(A), 208(a) of the Act, 8 U.S.C. §§ 1101(a)(42)(A), 1158(a) (1982); *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987); *Carcamo-Flores v. INS*, 805 F.2d 60 (2d Cir. 1986); *Guevara Flores v. INS*, 786 F.2d 1242 (5th Cir. 1986), *cert. denied*, 480 U.S. 930 (1987); *Matter of Vigil*, 19 I&N Dec. 572 (BIA 1988); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). The respondent bears the evidentiary burdens of proof and persuasion in any application for asylum under section 208(a) or withholding of deportation under section 243(h) of the Act. 8 C.F.R. §§ 208.5, 242.17(e) (1988); *Rebollo-Jovel v. INS*, 794 F.2d 441 (9th Cir. 1986); *Matter of Maldonado-Cruz*, 19 I&N Dec. 509 (BIA 1988); *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *modified on other grounds*, *Matter of Mogharrabi*, *supra*; *see also Young v. United States Dept. of Justice, INS*, 759 F.2d 450 (5th Cir.), *cert. denied*, 474 U.S. 996 (1985). We recognize, as have the courts, the difficulties faced by many aliens

---

ideal a norm of one child per family, backed by a massive, grassroots institutional effort involving education, contraceptive counseling, free contraceptive devices, and economic and social incentives and disincentives.

1985 Country Reports at 740-41 (emphasis added).

The effect of the economic reforms and the central policy of relaxing social controls in the rural areas has influenced the implementation of the birth-planning policy. In February the State Statistical Bureau published the results of a population sampling which indicated that 3.12 million more babies were born in 1986 than in 1985, 1.6 million more than the number planned for 1986. The increase was attributed to the rise in the number of multiple births and to the increased number of people of marriageable and childbearing age. According to the survey, in 1986 the crude birth rate rose to 20.7 per thousand compared to 17.8 per thousand in 1985. There was a slight decrease in the rate of abortions. *The number of first births in 1986 was 51.2 percent of the total, second births were 31.5 percent of the total, and third or more were 17.3 percent. Only 15 percent of all couples of childbearing age have signed a one-child pledge.*

*After years of resisting the view held widely outside China that the PRC had to take steps to limit the growth of its population, now at 1.08 billion, the post-Mao reform leadership decided to institute family planning programs.* During 1986-1987, China's leaders reiterated that family planning is a top national priority and expressed concern that the Government's policy has not been uniformly implemented in the past 12 months. The Government cited particular concern over the current unusually high number of females of childbearing age, increasing birth rates, and recent medical advances leading to longer life expectancies as reasons for renewed efforts to achieve its goal of limiting China's population to around 1.2 billion in the year 2000. Early in 1986, authorities began a massive campaign to extend education, contraceptive counseling, free contraceptive devices, and economic and social incentives down to the grassroots level.

1987 Country Reports at 665 (emphasis added).

42

in obtaining documentary or other corroborative evidence to support their claims of persecution. Although every effort should be made to obtain such evidence, the lack of such evidence will not necessarily be fatal to the application. The alien's own testimony may in some cases be the only evidence available, and it can suffice where the testimony is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis for his fear. *Matter of Mogharrabi, supra; see also, e.g., Blanco-Comarribas v. INS,* 830 F.2d 1039 (9th Cir. 1987).

In support of his appeal from the denial of his applications for asylum and withholding of deportation, the respondent makes a number of arguments to which we shall respond in turn.

The respondent initially submits that the Board should apply to this case certain "policy guidelines" announced by Attorney General Meese on August 5, 1988. These guidelines, however, were directed to the Immigration and Naturalization Service, rather than the immigration judges and this Board. *See* 8 C.F.R. §§ 2.1, 3.1, 236.1, 236.3, 242.2(d), 242.8(a) (1988); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954). The Service's apparent position is that the case before us on its facts does not come within the scope of the guidelines the Attorney General has directed "will be used by the Immigration and Naturalization Service in considering asylum requests from [individuals who cite a fear of persecution upon return to the PRC for having violated that country's 'one couple, one child' planning policy]."

The respondent's position on appeal is that he has a well-founded fear of persecution based on the likelihood he would face mandatory sterilization, that he has a reasonable fear of persecution as a member of a "particular social group" (namely, persons who actually oppose the government policy of "one child per family"), and that he is eligible for withholding of deportation under section 243(h) of the Act because he has demonstrated a clear probability of being sterilized if returned to China.

We do not find that the "one couple, one child" policy of the Chinese Government is on its face persecutive. China has adopted a policy whose stated objective is to discourage births through economic incentives, economic sanctions, peer pressure, education, availability of sterilization and other birth control measures, and use of propaganda. Chinese policymakers are faced with the difficulty of providing for China's vast population in good years and in bad. The Government is concerned not only with the ability of its citizens to survive, but also with their housing, education, medical services, and the other benefits of life that persons in many other societies take for granted. For China to fail to take steps to prevent births might well mean that many

43

millions of people would be condemned to, at best, the most marginal existence. The record reflects that China was in fact encouraged by world opinion to take measures to control its population.

There is no evidence that the goal of China's policy is other than as stated, or that it is a subterfuge for persecuting any portion of the Chinese citizenry on account of one of the reasons enumerated in section 101(a)(42)(A) of the Act. The policy does not prevent couples from having children but strives to limit the size of the family. It appears that exceptions are made so that couples facing certain hardships may have another child. The policy applies to everyone but expressly protects, and indeed is more leniently applied to, minority (non-Han) peoples within China. It appears to impose stricter requirements on Party members (state cadres) than on some non-Party members. The Chinese Government has stated that it does not condone forced sterilizations and that its policy is to take action against local officials who violate this policy.

The population problem arising in China poses a profound dilemma. We cannot find that implementation of the "one couple, one child" policy in and of itself, even to the extent that involuntary sterilizations may occur, is persecution or creates a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." This is not to say that such a policy could not be implemented in such a way as to individuals or categories of persons so as to be persecution on account of a ground protected by the Act. To the extent, however, that such a policy is solely tied to controlling population, rather than as a guise for acting against people for reasons protected by the Act, we cannot find that persons who do not wish to have the policy applied to them are victims of persecution or have a well-founded fear of persecution within the present scope of the Act.

Thus, an asylum claim based solely on the fact that the applicant is subject to this policy must fail. An individual claiming asylum for reasons related to this policy must establish, based on additional facts present in his case, that the application of the policy to him was in fact persecutive or that he had a well-founded fear that it would be persecutive on account of one of the five reasons enumerated in section 101(a)(42)(A). For example, this might include evidence that the policy was being selectively applied against members of particular religious groups or was in fact being used to punish individuals for their political opinions. This does not mean that all who show that they opposed the policy, but were subjected to it anyway, have demonstrated that they are being "punished" for their opinions. Rather, there must be evidence that the governmental action arises for a reason other than general population control (e.g., evidence of

44

disparate, more severe treatment for those who publicly oppose the policy). Finally, if the applicant claims that the punishment occurred at the hands of local officials, he must normally show that redress from higher officials was unavailable or that he has a well-founded fear that it would be unavailable.

We note that the respondent has not shown that mandatory sterilization is or was authorized under regulations or programs in effect in Fukien province, whence he came, or that forced sterilization has in fact occurred in his locality. The Country Report for 1987 reflects that 48.8% of the births in China in 1986 were second, third, or later births, which indicates that millions of persons in China were allowed or chose to have more than one child in that year. It also is support for the Chinese claim that the one-child policy is not routinely enforced by mandatory sterilization and abortion. The sole evidence at the hearing regarding this respondent's claim was his asylum application itself and his testimony. His testimony was simply not sufficiently detailed to provide a plausible and coherent account of the basis of his asylum claim and was contradicted by other information in the record. His asylum application undermines his testimony as it disclaims any mistreatment by the Government and does not refer to any fear stemming from China's population control measures. However, even if we accept the characterization of the evidence as set forth by the respondent on appeal (i.e., that he and his wife wished to have more than two children and he would be forced to undergo mandatory sterilization if returned to China), we would not find that evidence sufficient in itself to support a well-founded fear of persecution on account of a reason enumerated in section 101(a)(42)(a) of the Act. The respondent has not asserted or established that he was treated differently from other Chinese with respect to application of the "one couple, one child" policy, or that its application in his case was in reality a guise to achieve a governmental goal other than general population control.

Such a showing cannot be made by arguing that there is a "particular social group" made up of those persons who "actually" oppose the policy of "one couple, one child," and that the evidence that this "group" is persecuted is simply the fact that the policy is applied to them despite their opposition to it. If a law or policy is not inherently persecutive (as would be, for example, a law enacted to punish individuals because of their religious beliefs), one cannot demonstrate that it is a persecutive measure simply with evidence that it is applied to all persons, including those who do not agree with it. This is true even where questions of conscience or religion may be involved. In the United States, there are numerous cases upholding the imposition of religiously neutral laws against persons whose religious

45

beliefs conflicted with them. *See, e.g., United States v. Lee*, 455 U.S. 252 (1982) (imposition of Social Security taxes against Amish persons whose religious beliefs forbade payment of the taxes or receipt of the benefits did not interfere with the free exercise of their religion); *United States v. Merkt*, 794 F.2d 950, 954-57 (5th Cir. 1986), *cert. denied*, 480 U.S. 946 (1987) (conviction for illegally transporting aliens not barred by first amendment although defendants contended they were religiously motivated in conducting "sanctuary" activities), and cases cited therein.

The respondent submits that the freedom to have children is an absolute right under the 14th amendment to the United States Constitution and, for that reason, countries that abridge this right must be found to be engaging in acts of persecution. The resolution of the constitutional issues that could arise if the population problems underlying the implementation of the "one couple, one child" policy in China were to occur in the United States is a matter of speculation that it is hoped this country need never address. However, the fact that a citizen of another country may not enjoy the same constitutional protections as a citizen of the United States does not mean that he is therefore persecuted on account of one of the five grounds enumerated in section 101(a)(42)(A) of the Act.

The respondent points out that Congress has chosen to provide financial aid only to countries that employ voluntary family planning techniques. It has prohibited the use of such aid to coerce or provide any financial incentive to any person to undergo sterilization, or for the performance of involuntary sterilizations as a method of family planning, or for biomedical research relating to methods of performing abortions or involuntary sterilization as a means of family planning. However, the fact that Congress may strongly disapprove of a foreign country's policy does not mean that Congress has found that the policy involves "persecution on account of race, religion, nationality, membership in a particular social group or political opinion."[3]

The respondent submits that involuntary sterilization is both a violation of fundamental human rights and a denial of the "right to life, liberty, and ... security" within the meaning of 22 U.S.C. § 2151n(a) (1982), which restricts the use of international development funds in countries which engage in a consistent pattern of gross violations of internationally recognized human rights. However, even

---

[3]The respondent also states that on July 11, 1985, the House of Representatives "passed legislation" accusing China of coercive sterilization and abortion programs. While the House passed a bill on that date with such a provision, it was dropped from the final legislation. *See* H.R. Rep. No. 237, 99th Cong., 1st Sess. 101, 105, 118, *reprinted in* 1985 U.S.C.C.A.N. 210, 214, 227.

if involuntary sterilization was demonstrated to be a violation of internationally recognized human rights,[4] that fact in itself would not establish that an individual subjected to such an act was a victim of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." We are satisfied that if an individual demonstrated a well-founded fear that such an act would occur "on account of" a reason protected by the Act, the "refugee" definition in section 101(a)(42) of the Act would be met.

The issue before us is not whether China's population control policies, in whole or in part, should be encouraged or discouraged to the fullest extent possible by the United States and the world community. The issue is whether the respondent demonstrates persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion simply with evidence that he and his wife desire to have more than two children and that, because of China's population control measures, he may be subjected to mandatory sterilization. Where there is no evidence that the application of the policy is a subterfuge for some other persecutive purpose, we do not find that he demonstrates eligibility for asylum by this evidence alone. Whether these policies are such that the immigration laws should be amended to provide temporary or permanent relief from deportation to all individuals who face the possibility of forced sterilization as part of a country's population control program is a matter for Congress to resolve legislatively.

On the record before us we find that the respondent's claims are insufficient to establish that he has a well-founded fear of persecution on account of one of the five grounds enumerated in section 101(a)(42)(A) of the Act. Because the respondent has failed to demonstrate a well-founded fear of persecution, he has necessarily failed to demonstrate a clear probability of it. *See, e.g., INS v. Cardoza-Fonseca, supra; Carcamo-Flores v. INS, supra; Guevara Flores v. INS, supra.* Therefore, the respondent has failed to show that he qualifies for withholding of deportation.

The immigration judge denied the respondent's application for voluntary departure as a matter of discretion solely because the respondent made no reference to a lawful permanent resident sister on his request for asylum and mentioned a citizen "cousin" on the

---

[4]The State Department is required to make reports on human rights violations under 22 U.S.C. § 2151n(d)(1) (1982), which was amended in 1987 to require in addition a report on "practices regarding coercion in population control, including coerced abortion and involuntary sterilization." Pub. L. No. 100-204, Title I, § 127(1), 101 Stat. 1342 (1987).

47

application, who appeared "to be a pure fabrication." However, the Service does not challenge the respondent's testimony at the hearing regarding his relatives or the fact that he has a lawful permanent resident sister. We are not satisfied that the reference to a "cousin" on the asylum application was not simply caused by error, particularly as the closer, and more significant, familial relationship was not referenced. As this was the sole basis underlying the immigration judge's discretionary denial of voluntary departure and as the respondent does have a relative in the United States who at least potentially could file a preference visa petition on his behalf, considering the record in its entirety we will grant the respondent the privilege of voluntary departure in the exercise of discretion.

Accordingly, the appeal will be dismissed except insofar as it pertains to the denial of voluntary departure.

**ORDER:** The appeal is dismissed except insofar as it concerns the denial of voluntary departure.

**FURTHER ORDER:** The outstanding order of deportation is withdrawn, and in lieu of an order of deportation the respondent is allowed to depart voluntarily, without expense to the Government, within 30 days from the date of this order or any extension beyond that time as may be granted by the district director and under such conditions as he may direct. In the event of the respondent's failure so to depart, the order of deportation will be reinstated and executed.[*]

---

[*]By order of the Board dated April 5, 1990, pursuant to a motion of the Immigration and Naturalization Service, deportation proceedings in this case were reopened and terminated as improvidently begun.