STRAUB, Circuit Judge,
concurring:
I write separately because, although my colleagues believe we need not reach the issue of whether the BIA erred in declining to apply its “continuing persecution” reasoning in the genital mutilation context, I believe it prudent to decide the issue, as it provides petitioners with another potential avenue for relief.[1] For the reasons that follow, I conclude that even assuming the government had met its burden of demonstrating that the petitioners will not be subject to further mutilation or other related threats to their lives or freedom in the future, the BIA erred in failing to recognize female genital mutilation as a form of continuing persecution.

I. Forced Sterilization and Y-T-L-

In In re Y-T-L-, 23 I. & N. Dec. 601 (B.I.A.2003) (en banc), the BIA, assessing the asylum application of an applicant fleeing China due to its “one child” policy, held that even though forced sterilization was an act of persecution that would not be repeated, the fact that the act had occurred in the past could not in and of itself be used to rebut the presumption of a fear of future persecution because forced sterilization, unlike most other forms of persecution, constituted continuing persecution. Id. at 605. I conclude that the BIA erred in failing to treat female genital mutilation in the same manner, but in order to more fully explain my reasoning, some background as to the evolution of the assessment of forced sterilization claims is necessary.
*118 Initially, in In re Chang, 20 I. & N. Dec. 38 (B.I.A.1989), superseded by statute as stated in Guan Shan Liao v. U.S. Dep’t of Justice, 293 F.3d 61, 65 (2d Cir.2002), the BIA held that forced sterilization did not constitute persecution on account of any of the protected grounds. Id. at 44. See also In re G-, 20 I. & N. Dec. 764, 775 (B.I.A.1993) (“[W]e remain of the opinion that our interpretation of the law regarding China’s one couple, one child policy articulated in Matter of Chang is legally correct ....”) (citation omitted). In so holding, the BIA in Chang explicitly highlighted the need for congressional action as to this issue. See 20 I. & N. Dec. at 47 (“Whether [China’s population control] policies are such that the immigration laws should be amended to provide temporary or permanent relief from deportation to all individuals who face the possibility of forced sterilization as part of a country’s population control program is a matter for Congress to resolve legislatively.”). In response, Congress amended the INA as follows:
[A] person who has been forced ... to undergo involuntary sterilization ... shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure ... shall be deemed to have a well founded fear of persecution on account of political opinion.
8 U.S.C. § 110I(a)(42). At the time Congress enacted this amendment, the regulations provided that the presumption of a well founded fear of future persecution could only be rebutted by changed country conditions. See 8 C.F.R. § 208.13(b)(1)® (1997). Accordingly, the fact that a person had been forcibly sterilized in the past could not, in and of itself, be used to rebut the presumption of fear of future persecution. In 2000, however, the regulation was amended to provide that any fundamental change in circumstances could be used to rebut the presumption. See 8 C.F.R. § 1208.13(b)(1)®; 65 Fed.Reg. 76121-01 (Dec. 6, 2000).
In Y-T-L-, the BIA, acting en banc, applied the new regulatory framework to a case involving past forced sterilization. The BIA stated that “the [applicant] has no reasonable basis to fear [forced sterilization] in the future, based on the very fact that he has already been persecuted,” and that, as a result, under the new regulatory scheme, the presumption of fear of future persecution might be viewed as having been rebutted. 23 I. & N. Dec. at 606. However, the BIA, emphasizing “the special nature of the persecution at issue here,” as well as Congress’s intent in defining forced sterilization as persecution on account of political opinion, held that the fact that an applicant had been forcibly sterilized in the past could not itself be used to rebut the presumption of a fear of future persecution. Id. at 605-07. Specifically, the BIA reasoned:
The Immigration Judge’s conclusion fails to take into account the continuing nature of the persecution inflicted on the respondent and his wife. Moreover, the principal reason that the respondent and his wife no longer fear a coerced sterilization or abortion, or future fines for “over-birth,” is the fact that they have been rendered incapable of having children. Thus, the Immigration Judge’s rationale could lead to the anomalous result that the act of persecution itself would also constitute the change in circumstances that would result in the denial of asylum to persons such as the respondent.[2]
*119 Id. at 605 (emphasis added). The BIA further reasoned that “[t]he act of forced sterilization should not be viewed as a discrete, onetime act, comparable to a term in prison, or an incident of severe beating or even torture.” Id. at 607. Instead, forced sterilization is “better viewed as a permanent and continuing act of persecution.” Id. Accordingly, the BIA granted the application for asylum, holding that “the regulatory presumption of a well-founded fear of persecution arising from such past persecution has not been rebutted.” Id. at 607-08.[3]
The agency’s understanding of certain types of persecution as constituting continuing persecution is consistent with the language of the regulations. See Zhen Nan Lin v. U.S. Dep’t of Justice, 459 F.3d 255, 262 (2d Cir.2006); Qili Qu v. Gonzales, 399 F.3d 1195, 1203 (9th Cir.2005). The BIA, acting within the regulatory framework, reasonably determined that the fact that an individual had already undergone forced sterilization could not itself rebut the presumption of a fear of future persecution because, unlike other types of persecution, the act of forced sterilization is “permanent and continuing.” Y-T-L-, 23 I. & N. Dec. at 607. That is to say, even though the actual act of forced sterilization occurred in the past, the act continues to “deprive[] a couple of the natural fruits of conjugal life, and the society and comfort of the child or children that might eventually have been born to them.” Id. Unlike most other types of persecution, such as “a term in prison, or an incident of severe beating or even torture,” id., forced sterilization is performed once because it need only be performed once: it is for life. It stands to reason that if an applicant continues to be perse *120 cuted into the future, the presumption that the applicant’s life or freedom would be threatened in the future cannot be rebutted.

II. Application of the “Continuing Persecution” Reasoning to the Female Genital Mutilation Context

Because female genital mutilation, like forced sterilization, is a continuing act of persecution that, at a minimum, permanently deprives a woman of certain aspects of her sexuality, it follows that, like forced sterilization, the act of mutilation itself could not rebut the presumption that the applicant’s life or freedom would be threatened in the future.[4] See Mohammed v. Gonzales, 400 F.3d 785, 799 n. 22 (9th Cir.2005) (“[T]he principle that the fact of sterilization cannot be used by the government to rebut the fear of future harm was developed by the BIA ... as a recognition of the special, continuing, and permanent nature of coercive population control.... [T]he reasoning in the forced sterilization cases would appear to apply equally to the case of genital mutilation.”).
Since the day after it issued its decision in Y-T-L- on May 22, 2003, the BIA has, on numerous occasions in unpublished decisions, granted asylum or withholding of removal to victims of genital mutilation based on the finding that female genital mutilation is a continuing form of persecution. See, e.g., In re Bosede Olawumi, No. A70 651 629 (B.I.A. May 23, 2003) (per curiam) (“Forced female genital mutilation is better viewed as a permanent and continuing act of persecution that has permanently removed from a woman a physical part of her body, deprived her of the chance for sexual enjoyment as a result of such removal, and has forced her to [sic] potential medical problems relating to this removal.”); In re Mariama Dalanda Bah, No. A97 166 217 (B.I.A. Sept. 1, 2005) (per curiam) (“The persecution resulting from FGM is therefore continuing and permanent. Considering the continuing effects of such persecution, we find that the presumption of future harm has not been adequately rebutted simply because the procedure may not be repeated on the [applicant].”); In re Aisatou Sillah, No. A72 784 955 (B.I.A. Nov. 7, 2005) (“[T]he [IJ] observed in his decisions that the [applicant], who had been subjected to FGM, had suffered past persecution on account of a protected ground. The [IJ] noted that there was no indication that the effects of her persecution would dissipate and may be taken as permanent.... We find that the [IJ]’s observations are fully consistent with our decision in Matter of Y-T-L-.”) (citations omitted). Nevertheless, in September 2007, the BIA issued In re A-T-24 I. & N. Dec. 296 (B.I.A.2007), in which it reversed course and held that female genital mutilation was not a continuing *121 form of persecution.[5] In so holding, the BIA in my view committed several errors in reasoning.
First, in A-T-, the BIA reasoned that it “treated sterilization as continuing persecution [in Y-T-L-] because it would have contradicted Congress’s purpose to find that the very act that constituted persecution under the coerced population control provisions was itself a ‘fundamental change in circumstances’ that obviated a future well-founded fear.” A-T- 24 I. & N. Dec. at 300 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(A)). This was because, in the BIA’s view, unlike victims of genital mutilation, “[t]he statute defined victims of forced sterilization ... as qualifying for relief.” Id. But the fact that Congress specifically defined forced sterilization as persecution does nothing to meaningfully distinguish it from female genital mutilation, which, as set forth in the majority opinion, has been found to constitute persecution by the BIA and the vast majority of the courts of appeals.
In Y-T-L-, the BIA itself noted that Congress’s purpose in amending section 1101(a)(42) was to supersede prior BIA decisions that had held that forced sterilization did not constitute persecution on account of a protected ground. See 23 I. & N. Dec. at 603-04, 607 (“The principal issue of contention ... was whether such harm was on account of a ground protected under the Act. Congress has definitively answered that question ....”) (internal citations omitted). The legislative history of the amendment confirms the this notion. See, e.g., H.R.Rep. No. 104-469(1) at 173-74, 1996 WL 168955 (1996) (“The primary intent of [the amendment] is to overturn several decisions of the Board of Immigration Appeals, principally Matter of Chang and Matter of G- .... Nothing in [the amendment] is intended to lower the evi-dentiary burden of proof for any alien, no matter how serious the nature of the claim.”). Congress, in effect, did for forced sterilization claims what the BIA did in In re Kasinga, 21 I. & N. Dec. 357 (B.I.A.1996) (en banc), for genital mutilation claims: it provided for basic qualification for asylum and withholding of removal by defining forced sterilization as persecution on account of one of the protected grounds, without altering the regulatory framework for assessing such claims.[6] See Shi Liang Lin, 494 F.3d at 309 (“Congress has relieved ... persons who actually experienced, or are threatened with, a forcible abortion or sterilization from the burden of proving a political nexus in their particular cases.”). Thus, the reasoning of Y-T-L-that it would be “anomalous” under the statutory and regulatory framework to allow the “act of persecution itself [to] constitute the change in circumstances that would result in the denial of asylum,” 23 I. & N. Dec. at 605 — applies with equal force in the forced sterilization and female genital mutilation contexts. Accordingly, in my view, the BIA’s attempt in A-T- to distinguish the two contexts in this manner fails.[7] See Fox Television Stations, Inc. v. *122 Fed. Commc’ns Comm’n, 489 F.3d 444, 456 (2d Cir.2007) (“[Agencies] must provide a reasoned analysis for departing from prior precedent.”), cert. granted, — U.S. -, 128 S.Ct. 1647, 170 L.Ed.2d 352 (2008); Ke Zhen Zhao v. U.S. Dep’t of Justice, 265 F.3d 83, 95 (2d Cir.2001) (“[Application of agency standards in a plainly inconsistent manner across similar situations evinces such a lack of rationality as to be arbitrary and capricious.”); cf. Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (“[I]f the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency”) (internal quotation marks omitted) (emphasis added).
Like forced sterilization and unlike most other types of persecution, female genital mutilation continues to persecute its victims well beyond the initial act of mutilation. In In re Acosta, 19 I. & N. Dec. 211 (B.I.A.1985), overruled in part on other grounds by In re Mogharrabi, 19 I. & N. Dec. 439 (B.I.A.1987), in which the BIA for the first time announced parameters for the statutory term “particular social group,” the BIA stated that the purpose of persecution is to “punish [an individual] for possessing a belief or characteristic a persecutor seeks to overcome.” Id. at 223. In Kasinga, the BIA affirmed that genital mutilation fulfills this purpose, because “FGM is practiced, at least in some significant part, to overcome sexual characteristics of young women.” 21 I. & N. Dec. at 367. See also Mohammed, 400 F.3d at 798. In particular, as stated above, female genital mutilation is often performed in order to eliminate sexual pleasure in its victims, see, e.g., Abay v. Ashcroft, 368 F.3d 634, 638 (6th Cir.2004); Abankwah v. INS, 185 F.3d 18, 23 (2d Cir.1999), in order to ensure the victim’s fidelity in *123 marriage, see, e.g., Niang v. Gonzales, 422 F.3d 1187, 1192 (10th Cir.2005), or to prevent the victim from or punish her for engaging in premarital sex, see, e.g., Abay, 368 F.3d at 644 (Sutton, J., concurring); Abankwah, 185 F.3d at 20. In the cases before us, petitioners testified that as a result of the genital mutilation they suffered, they continue either to feel no pleasure or to experience pain during intercourse.
The BIA — in the present cases and in A-T--again attempts to distinguish female genital mutilation from forced sterilization, stating that it is more analogous to other' “lasting disabilities], such as the loss of a limb,” A-T-, 24 I. & N. Dec. at 300, and reasoning, “[t]he loss of a limb also gives rise to enduring harm to the victim, but such forms of past persecution are routinely assessed under the past persecution standards specified in the asylum and withholding of removal regulations,” id. at 301.[8] But the BIA conveniently stops short of taking this analogy to its logical conclusion. The loss of a limb or organ on account of a protected ground could never, in and of itself, be used to rebut a fear of future persecution or threats to life or freedom.[9] Indeed, as noted in the majority opinion, the parties have been unable to point us to a single instance outside the genital mutilation context where the BIA has accepted such an argument.
More importantly, in advancing this analogy, the BIA conflates continuing persecution with continuing harm. Compare Y-T-L-, 23 I. & N. Dec. at 607 (forced sterilization is viewed as a “permanent and continuing act of persecution”), with A-T-24 I. & N. Dec. at 299-300 (stating that female genital mutilation is a “continuing harm” that “has ongoing physical and emotional effects”). While the loss of a limb or organ undoubtedly carries with it lasting physical effects and continuing harm, the physical effects and harm will rarely be directly related to the protected ground on account of which the victim was persecuted. In contrast, in the genital mutilation context, as in the forced sterilization context, the form ■ of persecution itself — and consequently the harm suffered by the victim — is directly related to the victim’s protected group and the “characteristic[s][the] persecutor seeks to overcome,” Acosta, 19 I. & N. Dec. at 223, i.e., in the forced sterilization context, the ability to have children, and in the genital mutilation context, the woman’s “sexual characteristics,” Kasinga, 21 I. & N. Dec. at 367. As substantiated by petitioners’ testimony— including that they will for life be unable to experience pleasure from intercourse— and record evidence, at least some of the “sexual characteristics” of victims of female genital mutilation are suppressed by the act of mutilation itself and will continue to be suppressed for the rest of their lives as a result of the act. Such victims, therefore, not only continue to be harmed as a result of the form of persecution they endured, but also continue to be persecuted. In contrast, victims of most other types of persecution may experience lasting effects or harm resulting from the persecution, but the characteristics their persecutors “seek[ ] to overcome” will not have been suppressed or overcome for life based solely on the method of persecution. *124 Thus, even accepting as true the BIA’s unfounded assertion that genital mutilation is only performed once, like forced sterilization and unlike most other forms of persecution (including those with lasting adverse effects), it is only performed once because it need only be performed once: even after the initial act of mutilation, the persecution endures.[10] Accordingly, just as in the forced sterilization context, it stands to reason that because a victim of female genital mutilation continues to be persecuted into the future, the presumption that her life or freedom will be threatened in the future on account of one of the protected grounds cannot be rebutted.[11]
In sum, although I agree with my colleagues that the errors identified in the majority opinion themselves require remand, I would further hold that the BIA erred in failing to recognize female genital mutilation as continuing persecution because (1) the “continuing persecution” reasoning, which has been fully briefed and argued by all parties and amicus, provides petitioners with another potential avenue for relief; (2) the agency’s understanding of certain types of persecution, such as forced sterilization, as constituting continuing persecution is consistent with the regulatory framework for asylum and withholding of removal; and (3) the BIA’s attempt to distinguish female genital mutilation from forced sterilization does not withstand scrutiny.
I conclude by expressing my strong disapproval of the actions of the BIA in these cases. The BIA in the cases before us and in A-T- has attempted (unsuccessfully, in my opinion) to limit the reasoning and holding of Y-T-L- to the forced sterilization context. In so doing, as set forth in our majority opinion, it has failed even to treat claims based on female genital mutilation as it would (and should) claims based on any other type of persecution. The BIA refers, in passing, to the act of female genital mutilation as “reprehensible,” Matter of A-T- 24 I. & N. Dec. at 299, but its entirely dismissive treatment of such claims in these cases belies any sentiment to that effect. I am aware of the limited resources available to the agency in adjudicating its cases, see, e.g., Kadia v. Gonzales, 501 F.3d 817, 820-21 (7th Cir.2007); however, despite difficulties that may be presented by a lack of time or staffing, the BIA is expected to adequately fulfill its adjudicatory role by “exercising] care commensurate with the stakes” in cases such as these. Id. at 821. As set forth in the majority opinion, and as the BIA and the vast majority of the courts of appeals have recognized, female genital mutilation is a horrendous act of persecution that can have serious, life-long consequences. Victims of this practice, such as *125 the petitioners before us, are, at the very minimum, entitled to careful analysis as to whether they qualify for relief under the statutory and regulatory framework for asylum and withholding of removal claims. On this score, the agency has simply failed.
SOTOMAYOR, Circuit Judge,
concurring:
I fully join the majority opinion. I write separately only to note that I do not necessarily agree with my colleague’s analysis or conclusions in his concurring opinion on the issue of “continuing persecution,” and to further explain why I think it is imprudent for us to rule on the matter at this time. Withholding of removal is a form of relief that by statute is prospective looking only. 8 U.S.C. § 1231(b)(3)(A). It is only by regulation that a finding of past persecution gives rise to a presumption of a future threat to life or freedom for purposes of withholding of removal eligibility. 8 C.F.R. § 1208.16(b)(1)®. Thus, in the event that the government is able on remand to satisfy its burden of proving the unlikelihood of a future threat to petitioners’ life or freedom upon their return to Guinea, I cannot say at this time that it would be impermissible for the agency to deem petitioners ineligible for withholding relief. Cf. Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (substantial deference owed to agency’s interpretation of its own regulation unless the interpretation is “plainly erroneous or inconsistent with the regulation”) (internal quotation marks and citation omitted). However, because deciding the continuing persecution issue is (i) unnecessary to our disposition of these tandem cases, (ii) may never need to be decided after our instructions on remand are complied with, and (in) could have far reaching implications in other types of cases where ongoing physical or emotional harm from a prior perse-cutory act is alleged, I think it is imprudent for us now to decide the issue one way or the other.

. In particular, I note that the two bases for remand identified in the majority opinion are not necessarily determinative of the outcome of petitioners’ applications. Cf., e.g., Fay v. Oxford Health Plan, 287 F.3d 96, 103 (2d Cir.2002) ("Because this Court finds the first two issues dispositive, it does not reach the third issue.”). See also Vumi v. Gonzales, 502 F.3d 150, 156 (2d Cir.2007) ("It bears underscoring that the BIA must apply the correct standard on remand....”). Moreover, all parties and amicus have exhaustively briefed this issue. Cf., e.g., LNC Invs., Inc. v. First Fid. Bank, N.A, 173 F.3d 454, 468 (2d Cir.1999) ("Our decision not to reach this issue on the merits is reinforced by the fact that it has not been adequately briefed and argued before this Court.”).

. To the extent that the BIA by these words is interpreting the regulations as a general mat *119 ter to prohibit an act of persecution itself from being the "fundamental change in circumstances” that rebuts the presumption of fear of future persecution or threats to life or freedom, I agree. The regulations specifically provide that once past persecution is established, it takes a showing of a "fundamental change in circumstances” to rebut the presumption. 8 C.F.R. §§ 1208.13(b)(l)(i)(A), 1208.16(b)(l)(i)(A) (emphasis added). It stands to reason that the "change” contemplated by the regulations must have occurred since the past persecution occurred; otherwise, the "fundamental change in circumstances” portion of the regulations would be superfluous; the regulations could merely have provided that the presumption could be rebutted by a showing that the applicant would not be persecuted in the future or that the applicant's life or freedom would no longer be threatened in the future. As the authoring member of A-T- noted in his dissent in YT-L-, such language was indeed proposed, but the “fundamental change in circumstances” language was adopted so as to account for those individuals whose affected group did not fear future persecution but who had themselves experienced past persecution. See Y-T-L-, 23 I. & N. Dec. at 617 (Filppu, Board Member, dissenting). Because it is not clear whether the BIA indeed intended to express such an interpretation, I do not rest my concurrence on this ground. Cf. Delgado v. Mukasey, 516 F.3d 65, 69 (2d Cir.2008) ("[W]e give 'substantial deference’ to BIA decisions interpreting immigration regulations.”). I note, however, that the BIA did not address this possible interpretation of the regulations in the present cases or in A-T-, even though it is potentially determinative of the issue at hand, and I would encourage the BIA to do so on remand.

. I note that in Y-T-L-, it was the applicant’s wife — as opposed to the applicant himself— who had been sterilized. We subsequently held in Shi Liang Lin v. U.S. Dep’t of Justice, 494 F.3d 296 (2d Cir.2007) (en banc), that applicants could not obtain asylum based solely on the forced sterilization of their partners, id. at 300, and recently, the Attorney General came to this same conclusion in a published opinion, In re J-S-, 24 I. & N. Dec. 520 (A.G.2008). But these decisions did nothing to alter the basic holding of Y-TL--that past forced sterilization cannot in and of itself be used to rebut the presumption of fear of future persecution because the persecution is "continuing.”

. My colleague attempts to distinguish these cases from Y-T-L- by noting that withholding of removal “is a form of relief that by statute is prospective looking only.” However, this observation does nothing to distinguish Y-TL-, where the BIA also noted that asylum is a "prospective” form of relief. 23 I. & N. Dec. at 606 ("[T]his prospective view is not only unobjectionable, but is a bedrock principle of refugee law....”). Indeed, the asylum regulations provide that the only way an asylum applicant can be granted asylum based on the past persecution alone is based on the severity of the past persecution, see 8 C.F.R. § 1208.13(b)(l)(iii)(A), but the BIA was not operating under this regulation in Y-T-L-. The BIA was operating only within the parameters of the forward-looking portion of the asylum framework, and it satisfied the provisions of that framework by reasoning that forced sterilization was a form of persecution that continued on into the future. Accordingly, for the reasons set forth below, this reasoning applies with equal force in the context of withholding of removal claims based on female genital mutilation.

. The BIA apparently, for some unspecified period in advance of A-T-, began issuing unpublished decisions, such as the ones before us now, advancing the reasoning which later appeared in A-T-.

. Although the BIA's unpublished decisions are not precedential, see Ajdin v. BCIS, 437 F.3d 261, 264-65 (2d Cir.2006) (per curiam), I note in passing that this conclusion is supported by the fact that immediately following the issuance of Y-T-L-, the BIA, even in three-member decisions, began applying the "continuing persecution” reasoning in FGM cases without distinguishing the two contexts based on the amendment.

.To the extent that the BIA in A-T- now attempts to distinguish the two contexts on the ground that the amendment provides automatic relief to forced sterilization victims, such an interpretation is belied by the reason *122 ing and holding of Y-T-L-. The BIA in Y-TL- determined how to apply the new regulatory framework to forced sterilization cases, not that it need not apply it at all. But if the BIA in Y-T-L- had truly interpreted the statute as conferring per se relief to anyone who had suffered forced sterilization in the past, the "continuing persecution” reasoning would not be necessary because such cases would not be subject to the burden shifting regulations. See Mohammed, 400 F.3d at 799 n. 22. Indeed, the authoring member of A-T- noted as much in his dissent in Y-T-L-, which was joined by yet another member on A-T-. See Y-T-L-, 23 I. & N. Dec. at 613 (Filppu, Board Member, dissenting) ("The majority is correct that the statute equates persecution arising from a coercive population control program as being persecution ‘on account of political opinion.' The statute, however, does not direct that persons suffering such persecution be exempt from the normal rules that apply to all persons who have suffered past persecution on account of political opinion but who lack a reasonable fear of future persecution.”). To the extent applicants now receive relief based on the past act of forced sterilization alone, it is because of the reasoning set forth in Y-T-L-, namely that the persecution is continuing and thus a fear of future persecution cannot be rebutted. See Xue Hong Yang v. U.S. Dep’t of Justice, 426 F.3d 520, 522 (2d Cir.2005) (“The BIA has held that forced sterilization constitutes a form of permanent and continuing persecution that qualifies an alien for asylum under the INA.”) (citing Y-T-L-, 23 I. & N. Dec. at 606-07); Li Yong Cao v. U.S. Dep’t of Justice, 421 F.3d 149, 155-56 (2d Cir.2005) (“The BIA has held that because the persecution of forcible sterilization or abortion is 'permanent and continuous,' it inherently generates an irrebuttable presumption of a well-founded fear of future persecution.”) (citing Y-T-L-, 23 I. & N. Dec. at 605-08).
Moreover, even if the BIA were correct in stating that the statute itself provides for per se relief in the forced sterilization context based on "the past harm alone,” A-T-, 24 I. & N. Dec. at 300, for the reasons set forth below, it would still be reasonable to apply the "continuing persecution” reasoning in the female genital mutilation context.

. Similarly, in the cases before us, the BIA analogized genital mutilation to the loss of “a bodily organ.”

. See Diallo v. Mukasey, 268 Fed.Appx. 373, 2008 WL 508622, at * 11 (6th Cir.2008) (Moore, J., dissenting) (“We would not take seriously the argument that someone who lost a limb in the course of persecution on account of his social-group membership categorically could not establish a well-founded fear of future persecution only because he could not again lose that same limb.”).

. This distinction obviates the concern hinted at in my colleague’s concurrence that all cases "where ongoing physical or emotional harm from a prior persecutory act is alleged” would have to be granted under the "continuing persecution” reasoning. In order to invoke the "continuing persecution” reasoning in other contexts, victims of past persecution would have to show that they continued to be persecuted — not merely harmed — as a result of the form of persecution, that is to say, their particular "characteristic^” that their persecutors sought "to overcome” continue to be suppressed or overcome into the future as a result of the method of past persecution. Such a showing will be impossible in most cases outside the forced sterilization and female genital mutilation contexts.

. I am mindful of the fact that the continuing persecution that results from genital mutilation would occur regardless of whether the applicant was located in this country or in her home country; however, this fact does not serve to distinguish genital mutilation from forced sterilization. Moreover, there are obvious concerns with sending a person who continues to be persecuted to live among her persecutors.